767 So.2d 637 (2000)
Mitchel WESTERHEIDE, Appellant,
v.
STATE of Florida, Appellee.
No. 5D99-785.
District Court of Appeal of Florida, Fifth District.
September 29, 2000.
*640 James B. Gibson, Public Defender, and Nancy Ryan, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Richard L. Polin, Assistant Attorney General, Miami, for Appellee.
SAWAYA, J.

I. Introduction.
The State of Florida, the appellee, instituted commitment proceedings against Mitchel Westerheide, the appellant, pursuant to the "Jimmy Ryce Act,"[1] hereinafter referred to as the Act. The Act establishes *641 procedures for the involuntary civil commitment of sexually violent predators.[2]
The commitment trial commenced on March 1, 1999. The jury returned a verdict finding that the appellant is a sexually violent predator. Pursuant to this verdict, the trial judge entered a final judgment of commitment which committed the appellant to the Department of Children and Families for confinement in a secure facility for control, care, and treatment until such time as the appellant's mental abnormality or personality disorder has so changed that it is safe for him to be at large.
The appellant appeals the final judgment of commitment and, in this case of first impression in Florida, argues that the reversal is warranted for the following reasons: (1) the Act is unconstitutional because it violates the ex post facto, double jeopardy, due process, and equal protection clauses of the United States and Florida Constitutions; (2) the trial court erred by denying the appellant's requested jury instruction defining the statutory terminology "likely to engage in acts of sexual violence"; (3) the trial court erred by allowing the appellee's psychologists to testify that they believed the appellant would reoffend; (4) the trial court erred by allowing speculative testimony suggesting that sex offender probationers are lightly supervised; and (5) the trial court erred by allowing inflammatory testimony and argument. We affirm on all issues and find that the last two issues raised by the appellant are without merit and do not warrant discussion. The other issues will be addressed in separate sections of this opinion after we first discuss the factual background of these proceedings and the general provisions and nature of the Act.

II. Factual Background.
During the commitment trial, the appellee presented testimony from two expert witnesses, Drs. McClaren and Merwin, and from the appellant himself. The appellant presented evidence from one psychologist, Dr. Shaw. The appellee's two expert witnesses diagnosed the appellant as being a sexual sadist and having an antisocial personality disorder. Their diagnoses were based on consideration and review of extensive sources of information including the facts and circumstances surrounding the underlying offense for which the appellant was convicted; personal interviews with the appellant; police reports; reports from the Department of Corrections; correspondence between the appellant and other individuals; videotapes of the sex acts between the appellant and the victim of the underlying criminal offense; interviews with the victim, the appellant's father, and the appellant's friends; the appellant's personal diary; and the tests that were administered by the experts to the appellant. The expert called by the appellant admitted that the appellant is a sexual sadist. Although the appellant's expert admitted that the appellant might also have a personality disorder, he did not specifically diagnose the appellant as having an anti-social personality disorder.
In making their diagnoses, all three experts considered the fact that the appellant had previously been convicted of the offenses of lewd or lascivious assault on a child and sexual performance by a child. Of particular importance to the experts *642 were the underlying facts and circumstances of those prior offenses which disclosed that a sadistic sexual relationship existed between the appellant, who was 22 at the time of the offenses, and the female victim, who was 15 years old at the time. The appellant was convicted of these offenses on September 8, 1995 pursuant to a plea of guilty.
The testimony of the experts and their reports which were introduced into evidence at the commitment trial without objection revealed that the appellant pierced the victim's flesh with fishhooks, bound her during sexual encounters causing the victim pain, and video-taped episodes of sexual intercourse between the appellant and the victim. The appellant would give the victim LSD to help her endure the pain which he inflicted on her for over a six month period and told her to "learn pain." The evidence further revealed that the appellant inflicted pain on the victim by carving things into her skin, cutting her with razor blades, making hash marks on her back, carving the letter "M" on her chest, restraining her in bed with chains, restraining her with hooks in the wrist area which he removed by ripping them out, using a TENS unit to shock the victim, and inserting a knife into the victim's vagina and cutting her.
An investigator with the sheriff's department confirmed that at the time the appellant was arrested for these offenses, physical evidence which corroborated the sadistic nature of his acts was recovered which included: a wooden handled whip with five chains attached and shark hooks on it; a leather mask with a zippered mouth, which the appellant referred to in a letter he wrote as a "bondage mask"; fish hooks; a hollowed-out Bible with more fish hooks in it; and knives.
The experts also considered the appellant's own correspondence and his diary entries in arriving at their diagnoses. The appellee called the appellant as a witness at the trial and questioned him about his correspondence and his diary. The appellant admitted his authorship. One letter included a drawing of a human being with fish hooks in the forehead and neck. Other letters and portions of his diary included statements wherein the appellant: praised "true, organized, pure evil"; indicated how much he really felt hatred, stating that "love makes you weak, hate makes you strong"; and wondered whether he was "pure evil." In another letter, the appellant wrote that "the reason I would probably go to hell is because I have committed great atrocities on my part. Very very very bad things which are not forgivable." In other letters and portions of his diary, he simply stated that he had "no guilt, no sorrow, and no conscience." One of the experts, Dr. Merwin, summarized relevant portions of the appellant's diary when he testified as follows:
There are a couple of elements that relate to sexual sadism, not all of which are necessarily sexual in nature but more sadistic in nature. I can give you some examples of some of his ruminations and thoughts during his adolescence and late adolescence to adulthood based on what he described as a rather painful history of disappointing and humiliating human relationships.
At one point he wrote, if I were to destroy the world I would save the ones I hate most just to watch them suffer. I wouldn't want to die without my revenge, so in conclusion I keep my love and hate alive so it keeps me going.
I dream that it is raining. The rain I see is blood. The blood I see is theirs. They are the ones in pain. The pain is deep. The deeper the pain the stronger the feel. The gratitude runs through my veins. I'm seeing their faces. If they could see mine, I have their eyes, I own their souls. I make the pain deeper. I am their last penance, the judge of life and death. I can save them as they beg for mercy. I do not. Pain is good for the heart, good for the mind, fun time. And goes on in that similar vein. *643 Dr. Merwin further testified that in his conversations with the appellant, the appellant acknowledged the use of physical instruments designed to inflict pain or torture, but the appellant tended to minimize his use of those instruments by suggesting that he used them carefully to avoid inflicting pain on his victim. Dr. Merwin further testified that sexual sadism is a chronic and lasting condition which is progressive and that evidence suggests that sexual sadists experiment with other forms of behavior, typically become more sadistic, and engage in increasingly life-threatening kinds of behavior.
Dr. Shaw, the expert called by the appellant, testified that the appellant was a sexual sadist but did not diagnose him as having an anti-social personality disorder, although in his testimony he did admit that the appellant "may very well have a personality disorder." Dr. Shaw thought supervision through probation was sufficient, but also testified that "in the absence of probation and treatment, in the absence of being required to participate in treatment in the community, I would have recommended civil commitment."
Both of the appellee's experts concluded that the appellant satisfied the statutory definition of a violent sexual predator and that he suffers from two mental abnormalities or personality disorders that make him likely to engage in future acts of sexual violence if not confined in a facility that will provide him controlled care and treatment. Dr. McClaren specifically testified that based on his diagnosis, the appellant was a sexual sadist with an anti-social personality disorder, the combination of which is potentially lethal, and that there would be "a very high risk for reoffense" if the appellant was not confined in a secure facility. He also noted that the appellant had not received treatment in prison and that he had refused offers of treatment in the past. Dr. Merwin also testified that based on the same diagnosis, there was such a high degree of potential dangerousness from the appellant towards young women that supervision on probation would be inadequate and that confinement in a secure facility for care and treatment was necessary. Based on this and other evidence introduced during the trial, the jury returned its verdict finding that the appellant is a violent sexual predator under the Act.

III. General Provisions and Nature of the Act.

A. General Provisions.
The Act appears in Part V of Chapter 394, Florida Statutes, which is entitled "Involuntary Civil Commitment of Sexually Violent Predators." The Act was enacted after the Legislature recognized the existence of a "small but extremely dangerous number of sexually violent predators ... who do not have a mental disease or defect that renders them appropriate for involuntary treatment under the Baker Act...." § 394.910, Fla. Stat. (1999). To effectively deal with the serious problems caused by such dangerous individuals, the Legislature established "a civil commitment procedure for the long-term care and treatment of sexually violent predators." Id.
The Act defines a "sexually violent predator" as a person who "(a) [h]as been convicted of a sexually violent offense; and (b) [s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10), Fla. Stat. (1999). A "mental abnormality" is defined as "a mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses." § 394.912(5), Fla. Stat. (1999).
The Act establishes procedures which must be followed in order to commit any person as a sexually violent predator. The Department of Corrections or other agency with jurisdiction must give written notice to a multidisciplinary team and the state attorney of the circuit where the person was last convicted of a sexually *644 violent offense at least 365 days before the anticipated release date of the individual who meets the criteria under the Act.[3]See § 394.913(1), Fla. Stat. (1999). The multidisciplinary team will make an assessment whether the person meets the definition of a sexually violent predator and file a written assessment and recommendation with the state attorney. See § 394.913(3), Fla Stat. (1999). The state attorney may then file a petition with the circuit court alleging that the person is a sexually violent predator and seeking commitment under the Act. See § 394.914, Fla. Stat. (1999).
If a commitment petition is filed, the court must determine whether probable cause exists to believe that the person qualifies as a sexually violent predator subject to commitment. See § 394.915, Fla. Stat. (1999). If the court finds that probable cause does exist, the individual will be transferred to a secure facility. Id. Within 30 days after probable cause is found to exist, the court must conduct a trial to determine whether the person is a sexually violent predator. See § 394.916(1), Fla. Stat. (1999). The individual has a right to a jury trial and if the jury unanimously finds by clear and convincing evidence that the individual is a sexual predator, he or she will be committed to the Department of Children and Family Services "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." § 394.917(2), Fla. Stat. (1999). The individual is afforded other procedural safeguards that include the right to appointment of a public defender if the individual is indigent and the right to subsequently petition for release in the future. See §§ 394.916(3), 394.920, Fla. Stat. (1999).

B. Determination Whether The Act Is A Civil Or Criminal Proceeding.
In order to resolve several of the constitutional issues raised by the appellant, it is necessary that we determine whether the proceedings under the Act are civil or criminal. Specifically, a determination of whether the Act violates the double jeopardy and ex post facto clauses of the United States and Florida Constitutions will in large part depend on whether the Act is a civil or criminal proceeding.
In Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Court applied a two-prong test to determine whether a statute is civil or criminal. First, a determination must be made whether the legislature intended to enact a statute that establishes a civil proceeding. If the court determines that the legislature intended to enact a civil proceeding, deference will be given to the legislature's intent. The second prong of the test provides that the manifest intention of the legislature may be rejected if the party challenging the constitutionality of the statute presents "clear proof" that the statutory proceeding is "so punitive either in purpose or effect as to negate [the State's] intention to deem it `civil.'" Hendricks, 521 U.S. at 361, 117 S.Ct. 2072. The Florida courts apply a similar two-prong test. See Collie v. State, 710 So.2d 1000 (Fla. 2d DCA), rev. denied, 722 So.2d 192 (Fla.), and cert. denied, 525 U.S. 1058, 119 S.Ct. 624, 142 L.Ed.2d 563 (1998).[4]
*645 In ascertaining the legislative intent under the first prong of the test, the Court in Hendricks examined the legislature's description of the act as a "civil commitment procedure" and noted the placement of the act in the Kansas probate code as opposed to the criminal code. Based on these factors and examination of the face of the act, the Court concluded that the legislature intended to enact a statute that established civil proceedings. Thus, the effect of the act, the language contained in the act, and the legislature's intent, determine whether the act is civil or criminal under the first prong of the test.
The Florida Act is formally entitled "Involuntary Civil Commitment of Sexually Violent Predators," which alone indicates that the Act is intended to be civil. Furthermore, the Legislature specifically stated in section 394.910, Florida Statutes (1999) that "[i]t is therefore the intent of the Legislature to create a civil commitment procedure for the long-term care and treatment of sexually violent predators." In addition, other factors demonstrate that Florida's Act is civil in nature:
1) The Act, which became effective January 1, 1999, was moved from Chapter 916, Florida Statutes, entitled "Forensic Client Services Act" to Chapter 394, Florida Statutes, entitled "Mental Health," effective May 26, 1999.
2) The Act specifically requires application of the Florida Rules of Civil Procedure. See § 394.9155(1), Fla. Stat. (1999).
3) The primary focus of the Act is the commitment of the sexually violent predator to the Department of Children and Family Services for "control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." § 394.917(2), Fla. Stat. (1999).
We conclude that the Florida Legislature intended to establish a civil proceeding substantially similar to the Kansas act scrutinized by the court in Hendricks. However, the Court in Hendricks noted that civil labels pronounced by a legislature are not always dispositive. Therefore, the second prong of the test must be applied.
The second prong requires the party challenging the constitutionality of an act, the appellant in this case, to provide "`the clearest proof' that `the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it `civil.'" Hendricks, 521 U.S. at 361, 117 S.Ct. 2072 (quoting United States v. Ward, 448 U.S. 242, 248-249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). The Court in Hendricks applied several factors to determine whether the second prong of the test was met with regard to the Kansas act.
Specifically, the Court considered whether operation of the legislation will promote the traditional aims of criminal punishmentretribution or deterrence. The factors the Court considered in finding that the Kansas act does not promote punishment through retribution and deterrence were: (1) the legislation did not affix culpability for prior criminal conduct, but used prior criminal misconduct as evidence of a mental abnormality to support a finding of dangerousness; (2) scienter was not a prerequisite for commitment as it is for conviction of a criminal offense; and (3) commitment involves an affirmative restraint for the purpose of restricting the freedom of dangerously mentally ill individuals as opposed to inflicting punishment for criminal conduct.
*646 Application of these factors in this case leads us to similarly conclude that the Florida Act does not promote the traditional aims of retribution and deterrence and is, therefore, a civil rather than a criminal proceeding. In making this determination, we will not consider whether commitment under the Florida Act constitutes punishment from the offender's perspective, "as even remedial sanctions carry the `sting of punishment.'" Department of Revenue v. Kurth Ranch, 511 U.S. 767, 777 at n. 14, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (quoting United States v. Halper, 490 U.S. 435, 447, n. 7, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)).
First, the Act does not establish culpability for criminal conduct. Rather, the Act provides procedural and substantive rights designed and intended to apply to civil proceedings to ensure that both the state and the individual are provided a full and complete hearing to determine whether the individual is a "sexually violent predator" who needs commitment to a secure facility for care and treatment of their mental abnormality or personality disorder.[5] Second, the individual's past criminal conduct is merely used under the Act as evidence of the individual's mental or personality disorder to determine whether he or she is a sexually violent predator subject to commitment. Third, a finding of scienter is not required to determine whether the person is a sexually violent predator and it is not a prerequisite to commitment under the Act. Furthermore, nowhere in the Act does it provide that commitment is intended to punish the individual for his or her conduct. Rather, the provisions of the Act clearly indicate that commitment is for the purpose of "control, care, and treatment" of the sexually violent predator and the protection of the public from their dangerous behavior.
We also find that deterrence is not a goal of commitment under the Act. The Court held in Hendricks that sexually violent predators will probably not be deterred by the threat of commitment because they are, "by definition, suffering from a `mental abnormality' or a `personality disorder' that prevents them from exercising adequate control over their behavior." Hendricks, 521 U.S. at 362, 117 S.Ct. 2072; see also § 394.912(10), Fla. Stat. (1999). Thus, while commitment may prevent future abnormal behavior and contribute to the care and treatment of the individual confined, it will not serve the goal of deterring others from similar misbehavior.
We find, therefore, that the appellant did not meet his burden of showing that the Act is so punitive in purpose or effect as to negate the State's intention that the Act constitutes a civil proceeding. Thus, we conclude that the Act is civil, not criminal. Our conclusion is supported by a recent pronouncement by the Florida Supreme Court that the Act is civil in nature. See Standard Jury InstructionsCriminal Cases (99-2), 25 Fla. L. Weekly at S476, S476, ___ So.2d ___, ___, 2000 WL 766602 (Fla. June 15, 2000) ("The Jimmy Ryce Act provides for the civil commitment of `sexually violent predators' after their criminal sentences have expired.") (footnote omitted) (citation omitted); see also Valdez v. Moore, 745 So.2d 1009, 1011 (Fla. 4th DCA 1999) (In concluding that lack of an adversarial hearing to determine whether probable cause exists to detain individuals under the Act after their sentences have expired violates due process, the court stated, "The fact that this is a civil proceeding, however, does not mean that the petitioners are not entitled to due process.") (citations omitted).

*647 IV. Constitutional Issues.

A. The Presumption of Constitutionality.
It is a fundamental principle of our constitutional jurisprudence that "all doubts as to the validity of a statute are to be resolved in favor of constitutionality where reasonably possible." L.B. v. State, 700 So.2d 370, 373 (Fla.1997) (quoting Department of Law Enforcement v. Real Property, 588 So.2d 957, 961 (Fla.1991)). Thus, "[a] statute is presumed to be constitutional until shown to be otherwise." State v. Sobieck, 701 So.2d 96 (Fla. 5th DCA), rev. denied, 717 So.2d 538 (Fla. 1998); see also Scullock v. State, 377 So.2d 682 (Fla.1979); State v. Barnes, 686 So.2d 633 (Fla. 2d DCA 1996), rev. denied, 695 So.2d 698 (Fla.) and cert. denied, 522 U.S. 903, 118 S.Ct. 257, 139 L.Ed.2d 184 (1997). We find that this principle applies in this case. Hence, we begin our analysis of the Act by presuming that it is constitutional.

B. Ex Post Facto.
The appellant alleges that the Act violates the constitutional proscription against ex post facto legislation. The Ex Post Facto Clauses of the Florida and United States Constitutions prohibit laws that increase the punishment for a criminal offense after the crime is committed. See U.S. Const. art. 1, § 9, cl. 3 ("No ... ex post facto Law shall be passed."); U.S. Const. art. I, § 10, cl. 1 ("No State shall... pass any ... ex post facto Law...."); Fla. Const. art. I, § 10 ("No ... ex post facto law ... shall be passed."); see also Bouie v. Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); Meola v. Department of Corrections, 732 So.2d 1029 (Fla.1998); Gwong v. Singletary, 683 So.2d 109 (Fla.1996), cert. denied, 519 U.S. 1142, 117 S.Ct. 1018, 136 L.Ed.2d 894 (1997). A primary purpose of the Ex Post Facto Clause is "to ensure that citizens have prior notice of the consequences of committing a crime before the crime is committed." Meola, 732 So.2d at 1032.
The prohibition against ex post facto laws only applies to criminal legislation, not to civil proceedings. See Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); Rowe v. Agency for Health Care Admin., 714 So.2d 1108 (Fla. 5th DCA 1998); rev. denied, 727 So.2d 910 (Fla.1999); see also Ortega v. State, 712 So.2d 833 (Fla. 4th DCA 1998); Collie v. State, 710 So.2d 1000 (Fla. 2d DCA), rev. denied, 722 So.2d 192 (Fla.), and cert. denied, 525 U.S. 1058, 119 S.Ct. 624, 142 L.Ed.2d 563 (1998); Fletcher v. State, 699 So.2d 346 (Fla. 5th DCA 1997), rev. denied, 707 So.2d 1124 (Fla.1998). In Bouie v. Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) the Court gave the following definition:
An ex post facto law has been defined by this Court as one `that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action,' or `that aggravates a crime, or makes it greater than it was, when committed.'
Id. at 353, 84 S.Ct. 1697 (quoting Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798)).
Because we have determined that the Act is civil, not criminal, it is not an ex post facto law prohibited by the United States or Florida Constitutions. Furthermore, the appellant is not being punished for his original crime under the Act or for any other criminal conduct. His sentence for the underlying offense is completed and it is not being increased. Rather, the jury found, based on the evidence presented in a civil trial, that the appellant continues to be sexually violent and in need of care and treatment. In addition, the jury found that public protection from the appellant is necessary and that this is best accomplished by his confinement pursuant to the Act. Therefore, since the appellant is not being punished for any criminal act, his commitment under the Act does not violate the constitutional prohibition against ex post facto laws.

*648 C. Double Jeopardy.
The appellant alleges that the Act violates the Double Jeopardy Clauses of the Florida and United States Constitutions. The constitutional prohibition against double jeopardy prevents a second prosecution for the same criminal offense after acquittal or after conviction, and it prevents multiple punishments for the same criminal offense. See U.S. Const., amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...."); Fla. Const. art. I, § 9 ("No person shall be ... twice put in jeopardy for the same offense, ..."); North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); overruled on other grounds, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); State v. Wilson, 680 So.2d 411 (Fla.1996). Thus, the double jeopardy clauses of both the United States and Florida Constitutions apply to criminal proceedings, not civil proceedings. See Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); Collie v. State, 710 So.2d 1000 (Fla. 2d DCA 1998), rev. denied, 722 So.2d 192 (Fla.), and cert. denied, 525 U.S. 1058, 119 S.Ct. 624, 142 L.Ed.2d 563 (1998).
We have determined that the Act under review in this case is civil in nature and that confinement of the appellant is for treatment and protection of the public, not punishment. Therefore, commitment of the appellant is not a second criminal prosecution for the same offense and is not a second punishment for the same offense. Thus, the Act does not violate the double jeopardy clauses of either the United States or Florida Constitutions.

D. Due Process.

1. Less Restrictive Alternatives.
The appellant contends that the Act violates due process because it does not allow for consideration of less restrictive alternatives to confinement in a secure facility.[6] However, we agree with the appellee that the principle of less restrictive alternatives is rendered inapplicable by the definition of "sexual violent predator" under the Act.[7]
In essence, the Act requires that the jury find by clear and convincing evidence that the person is a violent sexual predator who has a mental abnormality that predisposes him or her to commit sexually violent offenses. Moreover, they must determine that he is likely to reoffend if not confined in a secure facility because his or her propensity to commit acts of sexual violence makes the person a menace to the health and safety of others. If the evidence fails to establish that the person is a violent sexual predator in need of secure commitment, that person will not *649 be civilly committed. Whether the person needs confinement in a secure facility or whether less restrictive alternatives are appropriate are evidentiary matters the jury may consider in determining whether the person is a sexually violent predator. If less restrictive alternatives are appropriate, the jury will find that the person is not a violent sexual predator and confinement will not be ordered. On the other hand, however, when the jury finds by clear and convincing evidence that the person is a violent sexual predator, it has concluded that there are no less restrictive alternatives to confinement that would adequately protect society and provide the necessary control, care and treatment of the individual. Thus, the fact that the Act does not mandate imposition of less restrictive alternatives after a person is found to be a sexual violent predator does not violate due process.
In the instant case, the jury was allowed to consider probation or community control for the appellant as a less restrictive alternative. The appellant presented an expert witness, Dr. Shaw, who testified that the appellant did have a mental abnormality and needed treatment. He also testified, however, that commitment as a sexual violent predator was not necessary because the appellant was going to be on probation with sex offender treatment. The appellant's expert, therefore, concluded that this was sufficient treatment and adequate protection for society. The jury disagreed and found that the appellant is a sexual violent predator requiring commitment in a secure facility. The fact that the court was not allowed under the Act to consider probation or community control as an alternative form of commitment for the appellant once he was found to be a violent sexual predator did not violate his right to due process.
We note that the Act makes provision for post commitment proceedings to determine whether a committed individual should continue in confinement. See §§ 394.918-.920, Fla. Stat. (1999). The issue whether less restrictive alternatives should be considered in post commitment proceedings under the Act is not before us. We, therefore, restrict our opinion concerning the applicability of less restrictive alternatives to the commitment trial proceedings and commitment pursuant to the jury verdict. We express no opinion whether less restrictive alternatives should be considered in post commitment proceedings; whether the provisions of section 394.911, Florida Statutes (1999) ("Less restrictive alternatives are not applicable to cases initiated under this part.") apply to prohibit consideration of less restrictive alternatives in post commitment proceedings brought under sections 394.918-.920; or the constitutionality of prohibiting consideration of less restrictive alternatives in post commitment proceedings.

2. The Vagueness Doctrine.
The appellant argues that the Act should be declared void because the definition of the term "mental abnormality" is unconstitutionally vague. The Act defines a "sexually violent predator" as "any person who (a) [h]as been convicted of a sexually violent offense; and (b) [s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10), Fla. Stat. (1999). The Act defines the term "mental abnormality" as "a mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses." § 394.912(5), Fla. Stat. (1999). The terminology "likely to engage in acts of sexual violence" is defined to mean "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." § 394.912(4), Fla. Stat. (1999). The appellant contends that these terms as defined in the Act are vague, especially the term "likely," which is used in the terminology "likely, to engage in acts of sexual violence."
*650 The vagueness doctrine was adopted to assure compliance with the due process clause of the United States and Florida Constitutions.[8]See Southeastern Fisheries Ass'n, Inc. v. Department of Natural Resources, 453 So.2d 1351 (Fla. 1984); State v. Rawlins, 623 So.2d 598 (Fla. 5th DCA 1993); State v. Hoyt, 609 So.2d 744 (Fla. 1st DCA 1992). Specifically, the vagueness doctrine applies to substantive due process requirements.[9] This doctrine prohibits enforcement of "`a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" United States v. Lanier, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)); see also State v. Wershow, 343 So.2d 605 (Fla.1977).
"A vague statute is one that fails to give adequate notice of what conduct is prohibited and which, because of its imprecision, may also invite arbitrary and discriminatory enforcement." Southeastern Fisheries Ass'n, Inc. 453 So.2d at 1353. The courts have held that "common understanding and reason" must be used in determining whether a statute is vague. Id. The Florida Supreme Court has held:
In determining whether a statutory provision is so vague as to violate due process of law, we must consider whether the provision is so vague that men of common intelligence must necessarily guess at its meaning. The test of vagueness of a statute is whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practice.
State v. Hagan, 387 So.2d 943, 945 (Fla. 1980) (citing Washington v. State, 302 So.2d 401 (Fla.1974), cert. denied, 421 U.S. 918, 95 S.Ct. 1582, 43 L.Ed.2d 786 (1975); Newman v. Carson, 280 So.2d 426 (Fla. 1973)); see also State v. Rawlins, 623 So.2d 598 (Fla. 5th DCA 1993) ("The vagueness doctrine was developed to insure compliance with the due process clauses of the state and federal constitutions which require that a law be declared void if it is so vague that one of common intelligence must necessarily guess at its meaning and differ as to its application.") (citing Webb v. Department of Prof'l Regulation, 595 So.2d 1103 (Fla. 5th DCA 1992)).
The supreme court in Hagan also held that the Legislature's failure to define a term in a statute does not in and of itself render the statute unconstitutionally vague. If the definition of a term is not provided in the statute, "resort may be had to case law or related statutory provisions which define the term." Hagan, 387 So.2d at 945. If the statute does not specifically define words of common usage, "such words are construed in their plain and ordinary sense." Id.; see also L.B. v. *651 State, 700 So.2d 370 (Fla.1997); Barr v. State, 731 So.2d 126 (Fla. 4th DCA 1999). Furthermore, dictionaries may be used to ascertain the meaning the Legislature intended to ascribe to a particular statutory term. See Sieniarecki v. State, 756 So.2d 68, 74 (Fla.2000) ("`If necessary, the plain and ordinary meaning of the word can be ascertained by reference to a dictionary.'") (quoting Green v. State, 604 So.2d 471, 473 (Fla.1992)); L.B., 700 So.2d at 372 (citing Gardner v. Johnson, 451 So.2d 477, 478 (Fla.1984)).
The appellant primarily complains that the term "likely" as used in the terminology "likely to engage in acts of sexual violence" is unconstitutionally vague. To resolve this issue, we turn first to Merriam-Webster's dictionary which defines "likely" as "having a high probability of occurring or being true: very probable." Merriam-Webster's Collegiate Dictionary 674 (10th ed.1999).[10] The appellant, when arguing in his brief that the definition of "likely" supports a jury instruction defining the term to mean "having a better chance of existing or occurring than not," gives the following definition: "Webster's Third New International Dictionary (unabridged) supports the requested jury instruction as well, since it defines "likely" as "having a better chance of existing or occurring than not."[11]
We turn next to the definitions in the case law. The Florida Supreme Court in In re Beverly, 342 So.2d 481 (Fla.1977) was confronted with determining the constitutionality of section 394.467, Florida Statute (1973) which provided that "[a] person may be involuntarily hospitalized if he is mentally ill and because of his illness is (a) likely to injure himself or others if allowed to remain at liberty, or (b) in need of care or treatment and lacks sufficient capacity to make a responsible application on his own behalf." (Emphasis supplied). Specifically, the appellant contended that the term "mentally ill" was unconstitutionally vague. The court held that the statute was constitutional and stated:
It is elementary that statutes may properly authorize the involuntary commitment of the mentally ill when the term `mentally ill' is given a satisfactory Legal meaning. Section 394.467(1), Florida Statutes, quoted above, imparts a sufficient Legal meaning to the term `mental illness' by setting criteria. Under the statute the pertinent inquiry is whether the person is mentally ill and [b]ecause of his illness is (1) likely to injure himself or others if allowed to remain at liberty, or (2) is in need of care or treatment and lacks sufficient capacity to make a reasonable application on his own behalf. These statutory standards are more precise than those discussed in Commonwealth ex rel. Finken v. Roop, [234 Pa.Super 155, 339 A.2d 764 (1975)] supra, as the Florida statutory language is adequate to warn that a person is subject to involuntary hospitalization only if he or she is likely to harm himself or others, or if he or she requires treatment and does not have the capacity to decide for himself. The *652 appellant's vagueness challenge to the statute is without merit.
Id. at 485 (emphasis supplied).
In Hill v. State, 358 So.2d 190 (Fla. 1st DCA 1978), the court addressed the appropriate standard that should be applied to the release of the criminally insane. The court held that the "likely-to-injure" standard under section 394.467(1)(a) as opposed to the "manifestly dangerous to others" standard under rule 3.460, Florida Rule of Criminal Procedure, is the appropriate standard.[12] The court specifically stated that "likely-to-injure requires a more exact prediction of harm; it connotes a probability of injury"; thus, "[l]ikely-to-injure emphasizes the dimension of probability." Id. at 195-96.
Courts in other states have upheld similar terminology in statutory schemes substantially similar to Florida's Act. In Martin v. Reinstein, 195 Ariz. 293, 987 P.2d 779 (App.1999), for example, the court was faced with a due process challenge to Arizona's Sexually Violent Persons Act which is substantially similar to Florida's Act. The Arizona act provides that to commit a person under the act, the state must establish that the person is a "sexually violent person" which the statute defines as "a person who [h]as been convicted of or found guilty but insane of a sexually violent offense or was charged with a sexually violent offense and was determined competent to stand trial," and "[h]as a mental disorder that "makes the person likely to engage in acts of sexual violence." Ariz. Rev.Stat. § 36-3701(7)(b) (1999). In finding that this term did not make the statute unconstitutionally vague under the due process clause of Arizona's constitution, the court stated:
We have defined "likely" as probable rather than merely possible. Thus Petitioners may not be committed upon the mere possibility of future dangerousness.
Reinstein, 987 P.2d at 800 (citations omitted). The California Supreme Court, in Hubbart v. Superior Court, 19 Cal.4th 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584 (1999), likewise rejected due process challenges directed against virtually identical terminology regarding a mental disorder that makes it "likely" that the individual will engage in sexually violent behavior.[13] Similarly, in In re Young, 122 Wash.2d 1, 857 P.2d 989, 1013-14 (1993), the court expressly rejected arguments that the terms "mental abnormality" and "likely" were unconstitutionally vague.
We find that the term "likely" as used in the terminology "likely to engage in acts of sexual violence" is a widely used term that is commonly understood by men and women of common intelligence to mean highly probable or probable and having *653 a better chance of existing or occurring than not. The meaning of "likely" is sufficiently clear and definite to avoid guessing or speculation concerning its intended meaning under the Act. We note that the fact that the Legislature "might, without difficulty, have chosen `clearer and more precise language' equally capable of achieving the end which it sought, does not mean that the statute which it in fact drafted is unconstitutionally vague." L.B. v. State, 700 So.2d 370, 372 n. 3 (quoting United States v. Powell, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975)); see also State v. Barnes, 686 So.2d 633, 637 (Fla. 2d DCA 1996).
We also find that the term "mental abnormality" which is clearly defined as "a mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses" is not unconstitutionally vague. See § 394.912(5), Fla. Stat. (1999). The United States Supreme Court held in Hendricks that the Kansas act which contains terminology that is substantially similar to the terminology in the Florida Act satisfies substantive due process requirements. The Court stated:
Kansas argues that the Act's definition of "mental abnormality" satisfies "substantive" due process requirements. We agree....
The challenged Act unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement. Commitment proceedings can be initiated only when a person "has been convicted of or charged with a sexually violent offense," and "suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." Kan. Stat. Ann. § 59-29a02(a) (1994). The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated.
Hendricks, 521 U.S. at 356-358, 117 S.Ct. 2072.
We note with interest that even the dissent in Hendricks agreed that the Kansas act complies with substantive due process requirements. Justice Breyer stated, "I agree with the majority that the Kansas Sexually Violent Predator Act's `definition of "mental abnormality"' satisfies the `substantive' requirements of the Due Process Clause." Id. at 373, 117 S.Ct. 2072 (Breyer, J., dissenting).
We conclude that the Florida Act, which contains identical terminology to that which the Court in Hendricks found in compliance with substantive due process requirements, is not void for vagueness and likewise complies with substantive due process requirements.

E. Equal Protection.
The appellant argues that the Act violates the equal protection clauses of the United States and Florida Constitutions. Specifically, he argues that since the standards for determining mental abnormalities or the likelihood of recidivism are vague, different experts that evaluate alleged sexual predators under those standards will come to different conclusions, which will result in differential treatment of alleged predators. In other words, the appellant argues that the allegedly vague standards for determining whether a person qualifies as a sexual predator under the Act will result in inconsistent findings concerning the ultimate determination whether a person falls within or outside of the statutory classification of sexual predator. We find this argument has no merit.
The equal protection clause is only concerned with whether the classification pursuant to a particular legislative enactment is properly drawn. We agree with the following explanation of the principal distinction between due process and equal protection:

*654 The equal protection guarantee has nothing to do with the determination of whether a specific individual is properly placed within a classification. Equal protection tests whether the classification is properly drawn. It is the guarantee of procedural due process that determines what process is necessary to find that an individual falls within or outside of a specific classification. Equal protection deals with legislative line drawing; procedural due process deals with the adjudication of individual claims.
Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law; Substance and Procedure, § 18.1, at 206-07 (3d ed.1999).
Thus, the argument presented by the appellant is more closely associated with due process requirements. In L.B. v. State, 700 So.2d 370 (Fla.1997), the court addressed this due process argument and held that a statute is not unconstitutional simply because inconsistent conclusions may be reached based on the application of the same statutory terminology. The court stated the reason for this rule:
It is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system.
Id. at 373 (quoting Roth v. United States, 354 U.S. 476, 492 n. 30, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). We have held in another part of this opinion that the terminology the appellant alleges will result in inconsistent treatment of alleged sexual predators is not unconstitutionally vague under the due process clauses of the United States or Florida Constitutions. Therefore, the possibility of inconsistent treatment of sexual predators under the Act because of potential inconsistent expert findings based on the statutory requirements of the Act does not render the Act unconstitutional under the due process clause.
We next consider the standard to apply in determining whether the Act violates the equal protection clause. The appellant contends that the strict scrutiny standard should be applied to determine whether the Act violates the equal protection clause and the appellee contends the less stringent rational basis standard should be utilized. We find that the Act does not violate the equal protection clauses under either standard.
Under the rational basis standard, the court must determine whether it is conceivable that the classification established by the Act bears a rational relationship to a legitimate state purpose. See Lite v. State, 617 So.2d 1058 (Fla.1993); Florida High School Activities Ass'n, Inc. v. Thomas, 434 So.2d 306 (Fla.1983); Rice v. State, 754 So.2d 881 (Fla. 5th DCA 2000) (citing Hershkowitz v. State, 744 So.2d 1268 (Fla. 3d DCA 1999)); Barr v. State, 731 So.2d 126 (Fla. 4th DCA 1999). "The burden is upon the party challenging the statute [the appellant in this case] to show that there is no conceivable factual basis which would rationally support such classification." Barr, 731 So.2d at 130. The courts generally accord the Legislature wide discretion in creating statutory classifications and recognize a presumption in favor of the statute's validity. See North Ridge Gen. Hosp., Inc. v. City of Oakland Park, 374 So.2d 461 (Fla.1979); Barr.
The strict scrutiny test generally applies only to statutes which are inherently suspect because "they impinge too greatly on fundamental constitutional rights, either under the federal or Florida Constitutions, or if they primarily burden certain groups that have been the traditional targets of irrational, unfair and unlawful discrimination." Palm Harbor Special Fire Control Dist. v. Kelly, 516 So.2d 249, 251 (Fla.1987) (citing Florida High *655 School Activities Ass'n., Inc.). This test requires that in order for the statute to be valid, it must be designed to advance a compelling state interest by the least restrictive means. Id.
We find that a rational basis for the classification created by the Act does exist. The protection of the public from violent sexual predators who are likely to reoffend and the need to provide them care and treatment for their mental abnormality while confined in a state institution is a rational basis for this classification. We also find that the Act meets the strict scrutiny test for the same reasons.
Furthermore, we find that the statute does advance the compelling state interest of treatment of the sexual predator and protection of the public by the least restrictive means available. The Act focuses on a very select group of violent criminal offenders who commit particular forms of predatory sex acts against both adults and children and who are incarcerated at the time commitment proceedings under the Act are commenced. Commitment as a sexual violent predator may not occur unless the state proves by clear and convincing evidence that the individual is a violent sexual predator who suffers from a "mental abnormality or personality disorder that renders him or her likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment" because "the person's propensity to commit acts of sexual violence is of such a degree that the person poses a menace to the health and safety of others." See § 394.912(4), (5), (10), Fla. Stat. (1999).
The problem addressed by the Act is acute, and the state interestsmental health treatment and protection of society are compelling. The goals of long-term treatment and protection of the public can only be accomplished by confinement in a secure facility until it is determined that the mental condition of the person "has so changed that it is safe for the person to be at large and that the person will not engage in acts of sexual violence if discharged." § 394.918(3), Fla. Stat. (1999). We also find that the provisions of the Act for subsequent review and possible release of the committed violent sexual predator supplement the efforts of the Legislature in providing the least restrictive means of advancing the compelling state interest of treatment and protection of the public under the Act. See §§ 394.918-.920, Fla. Stat. (1999).

V. The Jury Instructions.
The appellant requested a jury instruction defining the term "likely to engage in acts of sexual violence" to mean that the appellant "more likely than not will engage in such acts if not confined." The appellant offered two alternative definitions which defined the word "likely" to mean "more likely to happen than not" or "having a better chance of existing or occurring than not." The trial court denied each of these proposed jury instructions finding that the word "likely "was "a pretty commonly understood word." Therefore, the trial court instructed the jury as follows:
To prove the respondent, Mitchell [sic] Westerheide, is a sexually violent predator, the state must prove each of the following three elements by clear and convincing evidence.
One, Mitchell [sic] Westerhide has been convicted of a sexually violent offense. And two, Mitchell [sic] Westerhide suffers from a mental abnormality or personality disorder. And three, the mental abnormality or personality disorder makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term controlled care and treatment.
As to the first element, a sexually violent offense includes a lewd, lascivious or indecent assault or act upon or in the presence of a child.
With respect to the second element, the term mental abnormality means mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually *656 violent offenses. The term volitional means the act of will or choosing or the act of deciding or the exercise of will.
As to the third element, the term likely to engage in acts of sexual violence means a person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others.
This court has previously held that trial courts are generally accorded broad discretion in formulating jury instructions. See Reyka v. Halifax Hosp. Dist., 657 So.2d 967 (Fla. 5th DCA 1995). As such, the standard of review to be applied to a decision to give or withhold a jury instruction is abuse of discretion. See Barton Protective Servs., Inc. v. Faber, 745 So.2d 968 (Fla. 4th DCA 1999). The trial court's decision to give a particular instruction will not be reversed "unless the error complained of resulted in a miscarriage of justice or the instruction was reasonably calculated to confuse or mislead the jury." Faber, 745 So.2d at 974 (citing Reyka). Furthermore, if the jury instructions as a whole fairly state the applicable law, failure to give a particular instruction will not be error. See CSX Transp., Inc. v. Whittler, 584 So.2d 579 (Fla. 4th DCA 1991).
We find that the instructions given by the trial judge closely track the pertinent provisions of the Act and we find, therefore, that these instructions are an accurate statement of the law. Furthermore, the instructions given in this case were taken from proposed jury instructions published in the February 15, 1999 edition of the Florida Bar News.[14] The Supreme Court Committee on Standard Jury Instructions in Criminal Cases[15] made changes and revisions to the instructions before submitting the instructions to the Supreme Court, which republished the instructions in the August 1, 1999 edition of the Florida Bar News.[16] In Standard Jury InstructionsCriminal Cases (99-2), 25 Fla. L. Weekly S476, ___ So.2d ___, 2000 WL 766602 (Fla. June 15, 2000), the court authorized publication of the jury instructions for use in proceedings under the Act. We note that the specific instructions at issue in this case quoted above, which the trial court took from the February edition of the Florida Bar News, have not been changed or amended and are virtually identical to the instructions the court authorized for publication in its opinion. Moreover, we have previously discussed in another part of this opinion the definition of the term "likely," which we found to mean highly probable or probable and having a better chance of existing or occurring than not. Thus, the definition requested by the appellant would add nothing to the common meaning of that term. We conclude that the instructions given in the instant case did not result in a miscarriage of justice and they were not reasonably calculated to confuse the jury. Therefore, the trial court did not commit error in refusing to give the appellant's requested instructions.

VI. Admission Of Opinion Testimony By Appellee's Experts That The Appellant Would Likely Reoffend.
In the trial proceedings, specifically during the probable cause hearing and the jury trial, the appellant attempted to raise the issue that the opinions of appellee's two expert psychologists did not meet the Frye standard of admissibility. See Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). Specifically, the appellant objected *657 that the experts' use of the Minnesota Multiphastic Personality Inventory (MMPI) to predict the appellant's potential for reoffense must be scrutinized under the Frye analysis. However, the appellant abandoned that issue in these appellate proceedings when he realized that the MMPI was not used by the appellee's experts for this purpose but was only used for background information.
Since the appellant has abandoned the Frye issue, we will not address it other than to parenthetically note that the record clearly shows that in formulating their opinions, neither expert used any psychological profile or syndrome designed to identify violent sexual predators which may very well be subject to a Frye analysis. Rather, both experts rendered their opinions in this case based on their training and experience. Florida courts have consistently held that the Frye analysis does not apply to this type of expert testimony. See Hadden v. State, 690 So.2d 573 (Fla.1997); Flanagan v. State, 625 So.2d 827 (Fla.1993); Florida Power & Light Co. v. Tursi, 729 So.2d 995 (Fla. 4th DCA 1999). In Flanagan, the court held that while novel scientific evidence is not admissible unless it meets the test established in Frye, not all expert testimony is subject to the Frye analysis. The court stated the general rule as follows:
Of course, not all expert testimony must meet this test in order to be admissible.... [P]ure opinion testimony, such as an expert's opinion that a defendant is incompetent, does not have to meet Frye, because this type of testimony is based on the expert's personal experience and training.
Flanagan, 625 So.2d at 828. Courts in other jurisdictions that have specifically addressed application of the Frye analysis to expert testimony in cases involving sexually violent predator acts substantially similar to Florida's Act have held that Frye does not apply. For example, in People v. Ward, 71 Cal.App.4th 368, 83 Cal.Rptr.2d 828 (1999), the court specifically held that Frye does not apply to a "psychiatrist's prediction of future dangerousness or a diagnosis of mental illness" and concluded that "the trial court did not abuse its discretion when it admitted expert testimony regarding the likelihood that defendant was an SVP and likely to reoffend." Id. at 831-32.
The appellant here, however, maintains that the lower court erred in admitting expert testimony because a predicate was not established that the experts were capable of accurately predicting whether the appellant would reoffend. The admission of expert testimony from psychologists and psychiatrists for the purpose of predicting future dangerousness caused by mental illness or abnormalities is nothing new or novel to the law. The sciences of psychiatry and psychology have been an integral part of American jurisprudence since its inception and although this type of expert testimony is not amenable to mathematical precision, we find that predictions of future dangerousness are sufficiently accurate and reliable to be admissible. We are not alone in this decision. Courts in other jurisdictions have reached the same conclusion in cases involving application of statutory schemes similar to the Florida Act that commit violent sexual predators for control, care, and treatment. See In re Detention of Campbell, 139 Wash.2d 341, 986 P.2d 771 (1999); In re Young, 122 Wash.2d 1, 857 P.2d 989 (1993); Aguilar v. State, 77 Wash.App. 596, 892 P.2d 1091 (1995); People v. Ward, 71 Cal.App.4th 368, 83 Cal. Rptr.2d 828 (1999); see also Martin v. Reinstein, 195 Ariz. 293, 987 P.2d 779 (App.1999).
The United States Supreme Court in Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) explained why it rejected the contention that expert testimony on future dangerousness should be excluded from capital trials:
Acceptance of petitioner's position that expert testimony about future dangerousness is far too unreliable to be *658 admissible would immediately call into question those other contexts in which predictions of future behavior are constantly made. For example, in O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975), we held that a nondangerous mental hospital patient could not be held in confinement against his will. Later, speaking about the requirements for civil commitments, we said:
"There may be factual issues in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." Addington v. Texas, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979).
In the second place, the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but also as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.
463 U.S. at 898-99, 103 S.Ct. 3383 (footnote omitted).
We agree with the rationale adopted by the Court in Barefoot. Predictions of the likelihood of reoffense under the Act may be made by qualified experts with a sufficient degree of accuracy that renders such evidence reliable for admission into evidence. The reliability and accuracy of this expert testimony may be argued to the jury, the respondent in proceedings under the Act may present his or her own expert testimony regarding this issue, and the jury will give the evidence whatever weight they feel is appropriate. Thus, we find that expert testimony regarding the likelihood of reoffense under the Act assists the trier of fact in understanding the evidence and in determining facts in issue and should be admissible provided the opinions are rendered by witnesses who are qualified. See § 90.702, Fla. Stat. (1999).
The appellant argues that the experts called by the appellee were not qualified to render opinions regarding the likelihood of reoffense by the appellant. A witness may be qualified as an expert by either knowledge, skill, experience, training, or education or any combination thereof. See id.; see also Fla. R. Civ. P. 1.390(a). Whether a witness is sufficiently qualified as an expert is a matter to be resolved by the trial court. See § 90.105(1), Fla. Stat. (1999). The trial courts have wide discretion in determining whether a witness is qualified as an expert, and that decision will not be disturbed on appeal absent a clear showing of abuse of that discretion. See Carrier v. Ramsey, 714 So.2d 657 (Fla. 5th DCA 1998); Gulley v. Pierce, 625 So.2d 45 (Fla. 1st DCA 1993), rev. denied, 637 So.2d 236 (Fla. 1994); Ramirez v. State, 542 So.2d 352 (Fla.1989).
The record reveals that Dr. McClaren has an extensive background in forensic psychology, has dealt extensively with violent offenders and with mentally disordered sex offenders, and has attended training seminars with leading experts regarding risk assessment. Dr. Merwin also has an extensive background in psychology and forensic psychology. He has spent much of the past twenty years working with sexual abuse, victimization, sexual predators, and related matters and has attended seminars regarding the identification of sexual predators, including the *659 prediction of recidivism. The trial judge in the instant case heard all of the testimony relating to the qualifications of both experts and rendered his decision that they were both qualified to render opinions as experts in the field of forensic psychology regarding the relevant issues of whether the appellant qualifies as a violent sexual predator and the likelihood that he will reoffend in the future. We find that the trial judge did not abuse his discretion in rendering this decision.

VII. Conclusion and Certification of Questions of Great Public Importance
In conclusion, we affirm the order of commitment, finding no constitutional infirmities in the Act as alleged by the appellant; no error in the jury instructions given by the trial court; and no error in admitting the opinion testimony by the appellee's experts that the appellant would likely reoffend.
This opinion and the concurring opinion authored by Judge Sharp underscore the magnitude and importance of the constitutional issues raised in these proceedings regarding the Act. We also take this opportunity to underscore the importance of having these issues, which we find to be of great public importance, finally resolved by the Florida Supreme Court. Therefore, we certify the following as questions to be of great public importance:
1) DOES THE JIMMY RYCE ACT VIOLATE THE EX POST FACTO CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
2) DOES THE JIMMY RYCE ACT VIOLATE THE DOUBLE JEOPARDY CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
3) DOES THE JIMMY RYCE ACT VIOLATE THE DUE PROCESS CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
4) DOES THE JIMMY RYCE ACT VIOLATE THE EQUAL PROTECTION CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
AFFIRMED; QUESTIONS CERTIFIED.
ORFINGER, M., Senior Judge, concurs.
W. SHARP, J., concurs with certification and concurs specially, with opinion.
W. SHARP, J., concurring specially.
Although I have serious doubts about the constitutionality of the "Jimmy Ryce Act" in other cases, I concur in the result reached by the majority here.
In my view the most troubling aspects of this new statute and statutory procedure are the burdens of proof, and the statutory definition of persons who can be (essentially) confined for the remainder of their lives if found to be a "sexually violent predator." The reason I say this is because it should not be an easy process to commit a person under this Act, and I think the statutory wording is open to that distinct possibility. After being confined, the statute makes it very difficult for a person to get out. This makes the consequences of being found to be a sexually violent predator extremely grave, whether it is deemed to be a "criminal" or "civil" proceeding. The statute uses the words "care and treatment" rather than "punishment" but it is problematic whether such treatment programs actually exist or whether the ones in place are effective to treat such mental abnormalities or disorders.[1]
Once a person is determined to be a sexually violent predator, he or she is given the right to petition for release and the right to retain an expert to do a mental *660 examination or, if indigent, the right to have one appointed by the court. Thereafter, the court holds a "limited hearing" to determine whether there is probable cause to believe the person's condition has changed so that it is "safe for the person to be at large, and that the person will not engage in acts of sexual violence, if discharged."[2] (emphasis supplied) The confined person has no right to attend that hearing, although he or she has the right to be represented by counsel. Based on the language of the statute, the confined person has the burden of proof at that hearing and must prove that he or she will not repeat acts of sexual violence, a standard much higher than required by the statute in order to get that person confined in the first place.
The definition of "sexually violent predator" is indeed circular, as set forth in the statute. It reminds me of some dictionaries that define a word by reference to another word, which refers you back to the first word. For example, The American Heritage Dictionary defines "abnormal" as "not normal; deviant" and after turning to "deviant" one is referred back to "differing from the norm."
In the case of this statute, to be classified as a "sexually violent predator," one first must have committed a "sexually violent offense." The statute lists some specific statutes, which clearly include the crime for which Westerheide was convicted in this case. But one troubling aspect allows such a classification for "any criminal act, that has at any time been determined beyond a reasonable doubt to have been sexually motivated." § 394.912(9)(h), Fla. Stat. The possibilities of that latter category are infinite, and open to strange results. Would peeping Toms and Janes, or stalkers qualify?
The second part of the definition is the circular part: He or she "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence, if not confined in a secure facility for long term control, care and treatment." § 394.912(10)(b), Fla. Stat. Mental abnormality is defined as any mental condition "which predisposes the person to commit sexually violent offenses," and "likely to engage in acts of sexual violence" is defined "as a propensity to commit acts of sexual violence." In essence, when rolled together the statute defines sexual predator as a person who has committed a crime, specified by the statute, served the time for the crime in prison, and at the time of his or her release is "likely" to engage in acts of sexual violence in the future, unless confined for an indeterminate time, perhaps many years.
Since the second part of the definition turns on "likely," I agree with Westerheide that this term is key and vital, and that any jury instructions given should address what it means. The majority concludes that "likely" needs no further explanation to the jury because everyone in our culture or society knows what it means. I am not sure that is true. Some people use the term to mean there is a chance something will occur, although less than 50%. The prosecutor, in a companion case to this one, argued to the jury that "likely" meant to him, if there was a 20% chance the defendant/potential confinee would commit another sexually violent act, the test was met. One dictionary definition quoted by the majority says "likely" means a greater than 50% chance something will occur, and the other dictionary quoted by the majority says the probability must be a good deal more than 50%, a high probability of occurring. That is quite a range of possibilities, and one too great to pass constitutional muster, in my view, in an appropriate case.[3]
*661 Since this statute has very grave consequences for persons found to be sexually violent predators and since we (as courts) at least until this time in our democracy, have always sided with freedom for the individual, I would read the language of the statute as placing the highest barrier to being found to be a sexual predator.[4] The ending part of the statutory definition of "likely to engage" says this likeliness must be "of such a degree as to pose a menace."[5] Thus I would construe "likely" as meaning a high probability, greater than 50%.
That is, in fact, what the experts in this case testified about Westerheide. Dr. McClaren testified Westerheide's mental disorders were so grave as to be "lethal," and that there was a "very high risk" Westerheide would reoffend if not confined. And Dr. Merwin testified there was a "high degree" of potential dangerousness towards young women if Westerheide were released and not confined. Thus, in this case, I conclude there was no harmful error in not clarifying the meaning of "likely."
My final general concern about this statute is that it is not based on sound medical or scientific practices or findings, although Westerheide has dropped his Frye-test[6] argument in this appeal. The Legislature made a finding, in passing this statute, that there exists a small but very dangerous group of people called "sexually violent predators." However, there is no evidence this group truly exists and is identifiable.
Even if such a "syndrome" can be established by legislative fiat, there is also great uncertainty about the accuracy of psychiatric diagnosis and the prediction of future behavior. As Justice Brennan explained in his dissenting opinion in Jones v. United States, 463 U.S. 354, 378-379, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983):
It is worth examining what is known about the possibility of predicting dangerousness from any set of facts. Although a substantial body of research suggests that a consistent pattern of violent behavior may, from a purely statistical standpoint, indicate a certain likelihood of further violence in the future, mere statistical validity is far from perfect for purposes of predicting which individuals will be dangerous. Commentators and researchers have long acknowledged that even the best attempts to identify dangerous individuals on the basis of specified facts have been inaccurate roughly two-thirds of the time, almost always on the side of over-prediction. On a clinical basis, mental health professionals can diagnose past or present mental condition with some confidence, but strong institutional biases lead them to err when they attempt to determine an individual's dangerousness, especially when the consequence of a finding of dangerousness is that an obviously mentally ill patient will remain within their control.
It appears to me that in this case Westerheide should have been able to challenge the admissibility of the expert opinion offered against him on the ground that the experts have no scientific basis to enable them to predict future acts of violence. In *662 the dissent in In re Detention of Campbell, 139 Wash.2d 341, 986 P.2d 771 (1999), Justice Sanders opined that the expert testimony should not have been admitted because it was not based on accepted scientific principles:
In the dark heart of the sex predator statute is the legislative denial of free will and individual responsibility. This is true because a `sexually violent predator' is legislatively defined as one `who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence....' RCW 71.09.020(1). Necessarily one who simply commits a violent sexual act through volitional choice is outside the statute. Such an individual is what the criminal law is made for. But in theory the person who does this because his "mental abnormality" or "personality disorder" makes him do it is not a person acting by his free will and, consequently, not one who can be held accountable for his choices.
Therefore evidence is necessary to distinguish between those who volitionally act of their free will and those who don't. On its face future acts of violence based on free choice are not only outside the statute but would seem unpredictable in principle. On the other hand one would expect those acting out their non-volitional destiny by reason of a `mental abnormality' or `personality disorder' which causes violent sexual conduct would show themselves through the application of diagnostic criteria proved in the scientific arena to be reliable and accurate through repetition and replication. Reciprocally, when such predictions are not based on proven methodology they lack the competence justifying consideration by the trier of fact because they provide no factual assistance, only prejudice, speculation, and/or what some may call `junk science.'
The necessity for testimony based upon good science is only heightened by the statistical observation that 88 percent of sex offenders will not reoffend if released, although even if the ratio were reversed we would still require proof beyond a reasonable doubt that the specific individual at bar met the criteria. If expert testimony does not reliably and validly distinguish the individual within the statutory class subject to commitment from he who is not, a grave injustice has occurred because we have deprived an individual his liberty without sufficient factual basis.
986 P.2d at 786-787.
Justice Sanders noted that when conducting risk assessments, mental health professionals generally employ two distinct methods: the clinical approach or the actuarial approach. In this case, the experts employed the clinical approach and that is why, presumably, Westerheide dropped his Frye argument. But there is wide-spread agreement among mental health experts that clinical predictions of dangerousness are highly unreliable:
In literally hundreds of comparisons over many domains including the prediction of recidivism, clinical judgment has essentially never been found to be superior to actuarial methods, whereas the converse has most often been demonstrated (Grove & Meehl, 1996; Mossman, 1994). Some studies have shown better-than-chance (i.e., they outperformed blind guesswork) performance by clinicians, but many have not. No studies have demonstrated that clinicians' judgments are more accurate than those of laypersons, and there is at least one study showing that they are not (Quinsey & Ambtman, 1979).
Id. at 788, citing Grant T. Harris, et al., Appraisal and Management of Risk in Sexual Aggressors: Implications for Criminal Justice Policy, 4 Psych. Pub. Policy & Law, 73, 88 (1998).
In an article in the National Legal Aid and Defender Association, the author notes that sex offender civil commitment statutes have called upon psychologists to *663 make predictions of "unprecedented specificity" with "unprecedented certainty." However, the scientific literature in the field suggests that clinical judgment is a very poor predictor of future violence in general and sexual violence in particular:
In recent years, psychologists have developed actuarial tests to predict general and sexual violence. The Violence Prediction Scheme: Assessing Dangerousness in High Risk Men, Centre of Criminology, University of Toronto (1994). The actuarial tools have not been able to accurately predict sexual violence very well. Rice & Harris, "Cross-Validation and Extension of the Violence Risk Appraisal Guide for Child Molesters and Rapists," Law & Human Behavior, Vol. 21, No. 2, 231 (1997). Psychologists are constantly producing new articles on the risk factors for sexual recidivism. Defenders handling sex offender commitment trials need to find an expert to coach them in the recent literature; some of it can be used to demonstrate that most clinicians cannot predict sexually violent recidivism accurately enough to satisfy the legal standard of dangerousness. See Janus & Meehl, "Assessing the Legal Standard for Predictions of Dangerousness in Sex Offender Commitment Proceedings," Psychology, Public Policy, & Law, 3, 33-64 (1997). Also, recidivism rates for sex offenders are lower than the public perception.
Chris Jackson, Sex Offender Civil Commitment Litigation After Hendricks. http://www.nlada.org/indig/jan-feb98/jax.htm>.
In Yale Medicine, Dr. Howard Zonana estimated that the annual cost of caring for a committed sex offender is between $60,000 to $130,000 per patient. Dr. Zonana is a professor of psychiatry at Yale Medical School and clinical lecturer at Yale Law School and also chairs the American Psychiatric Association's Task Force on Sexually Dangerous Offenders. Dr. Zonana pointed out that treatment for sex offenders requires maximum security facilities that are not usually found in hospital settings and suggested that if sex offenders are unable to control their behavior, they should be given longer prison terms and those who need psychiatric treatment should have it available before the end of their criminal sentences.
Dr. Zonana was concerned that sexual predator commitment statutes provide a very low threshold for people to be determined mentally ill. Under these statutes, it is possible for sex offenders to be hospitalized based on remote past behavior and any mental abnormality or personality disorder that makes them likely to repeat their behavior. According to Dr. Zonana, this issue raises tough questions such as what mental illnesses or conditions are sufficient to meet the sexually violent predator requirement:
"This law is so broadly drawn that rapists who display anti-social behavior or traits could be hospitalized," says Dr. Zonana. "This is transforming criminal behavior into mental illness, further stigmatizing the mentally ill and serving a primary function of preventive detention."
Psychiatric Hospitals May Be Deluged With Sex Offenders, Yale Medicine (Winter/Spring 1998) http://info.med.yale.edu/external/pubs/ym ws98/scope/scope/runtext 6d01.html>.
According to a report from the Florida Office of Program Policy Analysis and Government Accountability,[7] Florida's sexually violent predator program has contracts with one psychiatrist and thirty-one psychologists throughout the state, to assess whether offenders meet the criteria for commitment. Prior to their contract, most of the evaluators did not have an *664 extensive expertise working with violent sexual predators and they had limited experience with the risk assessment instruments. The report notes that it is not possible for a psychologist to be certified by the American Psychological Association as having a speciality in this area, since such a speciality has not yet been defined or approved. The Department is still in the process of developing formal selection criteria for its expert evaluator and mandatory training. This is a clear indication to me that the law has leap-frogged over sound medical and scientific principles, and embraced concepts founded largely on hope, faith and fear.
NOTES
[1] Currently, the Jimmy Ryce Act appears as sections 394.910-.930, Florida Statutes (1999). See infra note two.
[2] The Act was originally found in sections 916.31-916.49, Florida Statutes (Supp.1998) which became effective on January 1, 1999. See Ch. 98-64, § 24, at 276, Laws of Fla. Shortly thereafter, the Legislature amended and renumbered the Act as sections 394.910.930, which are currently located in Part V, Chapter 394 of the Florida Statutes entitled "Involuntary Civil Commitment of Sexually Violent Predators." See Ch. 99-222, § 1, at 961, Laws of Fla. These changes became effective on May 26, 1999. See Ch. 99-222, § 29, at 972, Laws of Fla. Although the Legislature amended the Act, the amendments did not change the particular statutory provisions which apply to the instant case. Therefore, we will cite to the most recent statute found in chapter 394 in this opinion even though the proceedings in the instant case were actually brought against the appellant pursuant to chapter 916.
[3] The prior Act provided in section 916.33(1), Florida Statute (Supp.1998) that the notice must be given 180 days before release.
[4] The court in Collie was faced with the issue whether the appellant's classification as a sexual predator violated the constitutional prohibition against double jeopardy. The court cited United States v. Ursery, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) and adopted the two-prong test developed by the court in that case. The court in Collie stated: In Ursery, the Supreme Court developed a two-prong test to determine whether a regulation is punitive for double jeopardy purposes. Under the first prong, the court must look at the legislative intent to determine whether the regulation was intended to be punitive or remedial. If the legislative intent was for the regulation to be punitive, then the analysis is complete and the regulation violates double jeopardy. However, if the legislative intent was for the regulation to be remedial, the court must evaluate the second prong which is whether the regulation is so punitive in fact that it may not legitimately be viewed as remedial in nature.

Collie, 710 So.2d at 1008-1009 (citation omitted).
The Court in Hendricks adopted the same test but required the party challenging the constitutionality of the statute to prove the second prong by the clearest proof.
[5] Some of those procedural and substantive rights include the following: (1) the right to counsel, see §§ 394.915(3), 394.916, Fla. Stat. (1999); (2) determination of probable cause, see § 394.915, Fla. Stat. (1999); (3) application of the Florida Rules of Civil Procedure and the Florida Evidence Code, see § 394.9155(1),(2), Fla. Stat. (1999); (4) trial by jury, see § 394.916, Fla. Stat. (1999); and (5) the right to subsequent examinations and hearings to determine the right to release, see §§ 394.918-.920, Fla. Stat. (1999).
[6] The Act currently provides in section 394.911, Florida Statutes (1999) that "[l]ess restrictive alternatives are not applicable to cases initiated under this part." This statute became effective after the appellant's commitment.
[7] In order to establish that an individual is a sexually violent predator, the jury must unanimously find by clear and convincing evidence that the person has been convicted of a sexually violent offense such as: murder while engaged in a sexual battery; kidnapping or false imprisonment of a child and the commission of a sexual battery or a lewd or indecent assault or act on the child; sexual battery, etc. See § 394.912(9), Fla. Stat. (1999). In addition, the jury must unanimously find that the person "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10)(b), Fla. Stat. (1999).

In order for the jury to conclude the defendant has a mental abnormality, the jury must find that the person has a mental condition affecting his or her "emotional or volitional capacity which predisposes the person to commit sexually violent offenses." § 394.912(5), Fla. Stat. (1999). The jury must further find that the person is likely to engage in acts of sexual violence, which means that "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." § 394.912(4), Fla. Stat. (1999).
[8] Due process under the United States and Florida Constitutions requires that when an individual's interest may be adversely affected by legislative action, he or she must be given adequate notice of what is prohibited by the legislation. See U.S. Const. amends. V and XIV; Art. I, § 9, Fla. Const.; Southeastern Fisheries Ass'n, Inc. v. Department of Natural Resources, 453 So.2d 1351 (Fla.1984). Thus, the language of the statute must be "sufficiently definite to apprise those to whom it applies of the conduct it prohibits." Bertens v. Stewart, 453 So.2d 92, 93 (Fla. 2d DCA 1984); see also State v. Wershow, 343 So.2d 605 (Fla.1977).
[9] The guarantee of due process under the Florida Constitution requires compliance with substantive and procedural due process. See Department of Law Enforcement v. Real Property, 588 So.2d 957 (Fla.1991). Although each plays a distinct role in protecting an individual's right to due process, they frequently overlap and many cases do not adequately distinguish between the two. Substantive due process "protects the full panoply of individual rights from unwarranted encroachment by the government." Id. at 960. Substantive due process implicates the vagueness doctrine. Id. (citing Perkins v. State, 576 So.2d 1310 (Fla.1991); State v. Bussey, 463 So.2d 1141 (Fla.1985); State v. Barquet, 262 So.2d 431 (Fla.1972)).
[10] The term "likely" is also typically defined in dictionaries as meaning "probably." See e.g., American Heritage Dictionary 731 (2d ed. 1985) ("Possessing or displaying the qualities or characteristics that make something probable."). Black's simply defines the word as meaning "[p]robable.... Likely is word of general usage and common understanding, broadly defined as of such nature or so circumstantial as to make something probable and having better chance of existing or occurring than not." Black's Law Dictionary 925 (6th ed.1990) (citations omitted).
[11] Regardless of whether we ascribe a meaning of highly probable or probable, the term "likely" is sufficiently clear and understood by men and women of common intelligence to mean having a better chance of existing or occurring than not. Therefore, further definition of the term "likely" in a jury instruction as meaning "more likely to happen than not" or "having a better chance of existing or occurring than not" as argued by the appellant would add nothing to the plain and common meaning of the term and would be unnecessary.
[12] In Thomas v. State, 443 So.2d 406 (Fla. 4th DCA 1984), the court noted that the Legislature amended section 394.467 to embrace the "manifestly dangerous" test.
[13] The court cited Hendricks when it stated that "[t]he high court approved this statutory formula even though dangerousness was expressed in terms of a qualifying mental disorder giving rise to a likelihood of future criminal conduct." Hubbart, 81 Cal.Rptr.2d 492, 969 P.2d at 600. The court also noted the following:

Civil commitment statutes have long been upheld where dangerousness is expressed in terms of a "probability," "threat," or similar risk that a person who is presently mentally disturbed will inflict harm upon himself or others in the future if not confined. (Heller, supra, 509 U.S. 312, 317-318, 113 S.Ct. 2637[, 125 L.Ed.2d 257] [mentally retarded and mentally ill persons who pose "`a danger or a threat of danger'" to self or others]; Allen v. Illinois (1986) 478 U.S. 364, 366, fn. 1, 106 S.Ct. 2988, 92 L.Ed.2d 296 [mentally disordered sex offender with "`criminal propensities to the commission of sex offenses'"] (Allen); Greenwood v. United States, supra, 350 U.S. 366, 368, fn. 3, 76 S.Ct. 410, 100 L.Ed. 412 [mentally incompetent prisoners who "`will probably endanger the safety'" of others]; see Minnesota v. Probate Court (1940) 309 U.S. 270, 273-274, 60 S.Ct. 523, 84 L.Ed. 744 [statute providing for commitment of sex offenders who are "`likely to attack' "or injure others].)
Id. at 600 n. 26.
[14] Notice, Fla. B. News, Feb. 15, 1999, at 16.
[15] The court noted in Standard Jury Instructions Criminal Cases (99-2), 25 Fla. L. Weekly at S476, S478, ___ So.2d ___, ___, 2000 WL 766602 (Fla. June 15, 2000) that "while Jimmy Ryce Act proceedings are civil in nature, it was the criminal jury instruction committee that prepared, submitted, and urged the instructions and form at issue here."
[16] Proposed Amendments to the Standard Jury Instructions, Fla. B. News, Aug. 1, 1999, at 18.
[1] See Robert Bilbrey, Civil Commitment of Sexually Violent Predators: A Misguided Attempt to Solve a Serious Problem, Journal of The Missouri Bar, Vol. 55, No. 6 (Nov.-Dec.1999) http://www.mobar.org/journal/1999/novdec/bilbrey.htm>.
[2] § 394.918, Fla. Stat.
[3] See, e.g., Cuda v. State, 639 So.2d 22 (Fla. 1994) (terms "improper" and "illegal" as used in statute making it a crime to financially exploit aged persons or disabled adults were unconstitutionally vague); Brake v. State, 746 So.2d 527 (Fla. 2d DCA 1999) (crime of luring a child into a dwelling or conveyance for "other than a lawful purpose" was unconstitutional; term "other than a lawful purpose" failed to give adequate nature of proscribed conduct).
[4] See, e.g., Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (requiring elevated standard of proof in parental rights termination proceedings to alleviate possible risk that a factfinder might decide to deprive an individual of a fundamental interest based solely on a few instances of unusual conduct or idiosyncratic behavior); Dept. of Banking and Finance, Div. of Securities and Investor Protection v. Osborne Stern and Co., 670 So.2d 932 (Fla.1996) (where proceedings implicate the loss of one's livelihood, an elevated standard of proof is necessary to protect the rights and interests of the accused).
[5] § 394.912(4), Fla. Stat.
[6] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[7] The Sexually Violent Predator Program's Assessment Process Continues to Evolve, Report No. 99-36 (February 2000) http://info.med.yale.edu/external/pubs/ym ws98/scope>.