890 A.2d 372

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Harry DENGLER, Appellant.**

Supreme Court of Pennsylvania.

Argued May 17, 2005.

Decided Dec. 30, 2005.

Jeanne Trivellini, Andrea E. Mertz, Glenn D. Welsh, Reading, for Harry Dengler, appellant.

John Packel, Ellen T. Greenlee, Karl Baker, Philadelphia, for Defender Ass'n of Philadelphia, appellant amicus curiae.

Mark Carlyle Baldwin, Reading, Alisa Rebecca Hobart, for Com. of PA, appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice CASTILLE.

This appeal poses a discrete evidentiary issue of first impression arising out of the operation of Megan's Law II:[1]

---

1. Act of May 10, 2000, P.L. 74, No. 18 (as amended), 42 Pa.C.S. § 9791 *et seq.*

whether the opinion testimony of an expert witness at a hearing to determine if an offender is a sexually violent predator ("SVP"), and is therefore subject to the registration and notification provisions of Megan's Law II, is subject to the Pennsylvania test of admissibility for novel scientific testimony derived from *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923). The Superior Court held that such testimony is not subject to the *Frye* test as it does not involve novel scientific evidence. We agree and therefore affirm.

On April 27, 2001, the then-thirty-four-year-old appellant was at home with his twelve-year-old niece, R.K. The child was in appellant's bedroom watching a movie when appellant entered the room and locked the door behind him. He sat with R.K. for a period of time and then removed her pants and underwear, over the child's resistance. The child, however, successfully resisted appellant's attempt to remove her shirt and brassiere. Appellant fondled and kissed R.K.'s breasts over her clothing, fondled her vagina, inserted his finger in her vagina, and performed oral sex on her. The assault was interrupted only when the child's mother knocked on the bedroom door. Appellant opened the door and fled, leaving the child on the bed, naked from the waist down.

Appellant pleaded guilty pursuant to a negotiated plea agreement to one count each of aggravated indecent assault, 18 Pa.C.S. § 3125(a)(7), and corruption of minors. *Id.* § 6301(a). The Honorable Thomas J. Eshelman directed the State Sexual Offenders Assessment Board ("the Board") to perform an SVP assessment of appellant under Megan's Law II. By way of background, the registration and notification provisions of Megan's Law II apply to qualifying "offenders" and "sexually violent predators." Under the statute, an offender convicted of a qualifying predicate crime is required to register with the Pennsylvania State Police; where the offense is aggravated indecent assault, as here, the offender is subject to lifetime registration. 42 Pa.C.S. § 9795.1(b). The statute also directs that, after conviction but before sentencing for an offense subject to the registration requirement, the trial court is required to order an assessment by the Board to determine

if the offender should be classified as an SVP. *Id.* § 9795.4. After the report issues, and upon praecipe filed by the Commonwealth, the court must then schedule a hearing to determine SVP status. At the hearing, both the accused and the Commonwealth have the right to be heard and to call and cross-examine witnesses, including expert witnesses. The Commonwealth has the burden of proving to the court, by clear and convincing evidence, that the defendant is an SVP. *Id.* Those adjudicated by the court as SVPs are subject to additional measures; for example, among other things, the statute directs the State Police to notify neighbors, as well as day care centers and school officials within the municipality, of the SVP's presence in the community. *Id.* §§ 9797–98.[2]

The Act defines a "sexually violent predator," in relevant part, as "[a] person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." *Id.* § 9792. The Act defines "predatory" as "[a]n act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." *Id.* Section 9795.4 directs that the Board, in order to facilitate SVP assessments, "establish standards for evaluations and for evaluators conducting the assessments." *Id.* § 9795.4(b). The Section further provides that:

An assessment shall include, but not be limited to, an examination of the following:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

(iii) The nature of the sexual contact with the victim.

2. In 2004, the General Assembly added an additional notification provision, governing information to be made available on the Internet concerning offenders and SVPs. 42 Pa.C.S. § 9798.1.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age of the individual.

(ii) Use of illegal drugs by the individual.

(iii) Any mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

*Id.* § 9795.4(b).[3]

In response to the court's order, the Board issued a written Sex Offender Evaluation prepared by Board Member Veronique N. Valliere, a licensed psychologist with a doctoral degree in clinical psychology, which concluded that appellant met the statutory criteria for classification as an SVP. In her report, Dr. Valliere noted that a Board Investigator had attempted to interview appellant for purposes of the assessment, but he declined to cooperate. The report also noted the sources Dr. Valliere had consulted in rendering her evaluation,

---

**3.** There is no issue on this appeal concerning the court's compliance with the procedural requirements of Megan's Law II, nor any challenge to the substantive requirements of the law. For a fuller discussion of the operation of Megan's Law II, *see generally Commonwealth v. Williams,* 574 Pa. 487, 832 A.2d 962, 965–68 & nn. 6, 8–12 (2003).

which included court records, the probable cause affidavit, and court records relating to two prior sexual offenses appellant committed upon minors: one of which resulted in a guilty plea to the 1991 statutory rape of a thirteen-year-old girl; and the second of which, arising in February 2001 and involving a fifteen-year-old girl, was an open matter at the time of the instant offense. The records also revealed that appellant had suffered a head injury in the past, that he had engaged in other criminal behavior not involving sexual assault (multiple thefts, unsworn falsification, driving under the influence), and that he had a history of drug and alcohol abuse. Sex Offender Evaluation, 1–4; N.T. 7/18/02, 71–74.[4]

In her written analysis, Dr. Valliere stressed, *inter alia,* that appellant had a repeat history of sexually assaulting young teen or pre-teen females; that his descriptions of the offenses revealed an "engrained" "fantasy life" in which he believed the victims were "com[ing] on strongly to him, presenting themselves in a seductive, aggressive way" and "keep coming back for more;" and that he appeared to have no control over himself when presented with an opportunity to offend, electing to do so in high-risk situations where he was likely to be caught, which revealed a high motivation to offend. Dr. Valliere then set forth her diagnosis as follows:

[Appellant] meets the criteria for classification as a sexually violent predator. [Appellant] is driven to repeatedly sexually assault young girls due to his sexual arousal to them, potentially exacerbated by organic contributors to his behavior. [Appellant] has already formed a pattern of assaultive behavior to [sic] young girls. He has three documented victims. In fact, [appellant] is so motivate[d] to assault children, he assaulted his last victim soon after his arrest for his second victim. Even facing incarceration did not prevent him from offending.

[Appellant] has the traits of impulsivity, poor judgment, a lack of empathy, and a disregard for the consequences of his

4. The written Sex Offender Evaluation, which was admitted into evidence at the SVP/sentencing hearing, is attached to the end of the transcript and is paginated consecutively to the hearing notes.

behavior. He has a history of criminal behavior and defiance of the legal system. [Appellant] likely meets diagnostic criteria for Personality Disorder NOS [not otherwise specified]. However, given his history of serious head injuries, he may meet criteria for diagnosis of Personality Change due to a head injury. Regardless of the source, [appellant] has a condition that contributes to the likelihood that he will sexually offend.

[Appellant] has other factors as well. He meets diagnostic criteria for Polysubstance abuse. Records indicate that he has abused alcohol and marijuana as well as other drugs. Substance abuse/dependence is common in sexual offenders. Alcohol, as a pharmacological agent, serves to lower an offender's conflict about committing an offense, as does marijuana. *It is not a cause for sex offending or does not cause sexual arousal to children.* Instead, it helps offenders act on offending urges that they may resist more effectively when sober, increasing recidivism risks substantially. [Appellant] has not sought treatment for his problem nor has he succeeded in using the treatment he has had to remain sober. [Appellant] has refused sexual offender treatment.

[Appellant] has a past history of sexual offenses as well as a past history of criminal behavior. He has numerous parole/probation violations and has been unmanageable under supervision. [Appellant's] offense behaviors show a pattern, in both action and fantasy. [Appellant] demonstrates arousal to young teen or pre-teen victims. There is no evidence of unusual cruelty in [appellant's] offenses.

*Id.* at 5–6; N.T. 7/18/02, 75–76 (emphasis original). On the statutory question of personality disorder or mental abnormality, Dr. Valliere then noted that appellant "shows deviant sexual arousal and a mental abnormality that contributes to his likelihood of reoffending;" on the issue of predatory behavior, she noted that appellant "creates and promotes relationships with his victims solely for his sexual gratification, taking advantage of opportunity in a highly predatory way." *Id.* at 6; N.T. 7/18/02, 76.

On July 18, 2002, the court held a Megan's Law II/ sentencing hearing at which Dr. Valliere testified. Dr. Valliere noted that, in addition to her academic studies involving sexual offenders, she had conducted both psychological and risk assessments on both incarcerated and outpatient sex offenders, assessments which included therapy, evaluation, testing and group therapy. Dr. Valliere noted that she had been a member of the Sex Offender Assessment Board since 1997; that she had both received and provided training in risk assessment of sexual offenders; that she had conducted over 200 sexual offender assessments; and that she had testified as a qualified expert on the question of SVP status in over 100 court proceedings. Dr. Valliere indicated her familiarity with the statutory standard at issue, and noted that she had undergone "hundreds of hours of training in understanding sex offenders' dynamics, deviate sexual arousal, sexual offense behavior, crime analysis, risk assessment, as well as reading and self-study of all the body of research related [sic]." N.T. 7/18/02, 3–9. Appellant conceded Dr. Valliere's general expert qualifications, but challenged whether her opinion that appellant was an SVP was admissible under the *Frye* test.

Over appellant's objection, Dr. Valliere testified at some length, consistently with her written report, that appellant met the statutory criteria for classification as an SVP. She noted, among other things, that appellant had a significant and deviant sexual arousal response to young girls, *i.e.*, that a common thread in appellant's own description of the three separate sexual offenses he had committed was his view that the children were "highly seductive," "coming on very sexually aggressive to him," and that he simply obliged them. In the doctor's view, "this is more than just your typical denial or victim blaming that we see with offenders. This kind of disclosure reflects their fantasy world.... [I]n their fantasy, the children want it, demand it, that they're so irresistible; and this enhances the experience." Such a disclosure, in Dr. Valliere's view, shows "a high degree of psychological investment in the sexual gratification, and that goes to speaking

toward the mental abnormality which is the deviance towards young girls." *Id.* at 10–17.

Dr. Valliere added that, in assessing appellant's risk to reoffend, the other significant deviance in his behavior is that neither the victim's resistance, nor the risk involved in committing his crimes, "decreased his arousal" or acted as a deterrent, all of which spoke to "his drive to sexually assault." The doctor also deemed it significant, in assessing appellant's "impulses" and his risk to reoffend, that he was "opportunistic:" "what we see with sexual offenders who are this highly opportunistic is that their pump is primed, so to speak, that they are so ready and fantasy driven that if they do happen upon an opportunity they know how to use it and choose to use it very quickly." *Id.* at 17–18. Turning to the question of whether appellant's behavior was "predatory," Dr. Valliere opined that the following considerations, among others, suggested an affirmative answer: the fact that appellant approached his victims for his own sexual gratification; the fact that he had multiple victims, thus showing a "pattern of repeated behavior;" his prior criminal history, which revealed a "maladjustment to supervision" as he violated probation and parole; and his polysubstance abuse. *Id.* at 21–22.

Appellant's counsel cross-examined Dr. Valliere at considerable length, eliciting first the fact that the statutory terms involved in assessing SVP status (such as "mental abnormality" or "sexually violent predator") are not diagnostic terms commonly employed in the fields of psychiatry or psychology. Dr. Valliere noted, however, that "predator" is a "commonly accepted psychological phrase" even if it was not a distinct diagnosis. *Id.* at 25, 31. Moreover, when asked whether there was a test or methodology within the professional psychological or psychiatric communities which would allow for determining SVP status, the doctor noted that there "is a body of research in terms of risk assessment and risk of recidivism. There are characteristics, and there are behavioral patterns that we look at." When pressed whether there was some specific diagnostic criteria for making the SVP determination, along the lines of the criteria typically used to assess such

things as personality disorders, Dr. Valliere noted that the statute itself set forth the governing criteria. The doctor then added, "there is a body of research that lays out different criteria which the legislature expressly incorporated into the law, like multiple victims, personality disorder; and these are all supported by literature." *Id.* at 32–33. The doctor also noted that her task in forming a judgment as to SVP status did not involve a simple clinical judgment or opinion because, under the statute, "I can't say it's based just purely on my opinion or judgment. There are things that are outside my judgment that I also use, namely, the research, his behavior, his past records, his previous diagnoses, those things that are not just about my judgment. I'm the one that adds all those things up and say do they meet this criteria, but it's not simply my judgment or opinion." *Id.* at 35.

Appellant then turned from methodology to Dr. Valliere's SVP assessment itself, questioning the validity of any prediction that appellant would reoffend, particularly given the time that would elapse before he would be released from prison, the potential rehabilitative effect of incarceration and sex offender treatment, and the fact that the doctor did not have the benefit of an interview with appellant. In response, Dr. Valliere noted that, "[p]redictions of likelihood are notoriously unreliable. Assessment of likelihood is more reliable.... And I think [appellant] has a behavioral pattern of deviant sexual arousal, personality traits that make him likely to act out on his behavior again at some time." *Id.* at 40. The doctor stressed that the SVP assessment does not involve a prediction of recidivism but an assessment of risk given certain factors relevant to sex offenders. The doctor described the task as follows:

> You're going to see if they have the deviance, personality traits, basic ... sex offender symptoms, so to speak, that make them likely that this isn't going to disappear in them. Deviate arousal doesn't disappear in people. Personality disorders don't disappear in people. And when they're combined to exhibit themselves in sexual criminal behavior, these things don't disappear. And we don't know how to

cure deviate sexual arousal. We don't know how to cure personality disorders. So that's what we look for in terms of they existed, now they motivated predatory behavior [sic]. They're not going to disappear tomorrow. They're likely to motivate—I mean, likely is a legal term that says this person did this in the past, are they like—is he different from you or I[sic] in terms of acting out this behavior in the future? And he is, based on his behavioral pattern and all the things described in his past.

*Id.* at 47.

At the conclusion of Dr. Valliere's testimony, the trial court found that appellant was an SVP. The court then proceeded to sentencing and sentenced appellant to a term of imprisonment of two and one-half to ten years for aggravated indecent assault, to be followed by five years of probation for corruption of minors. Appellant was also apprised that, upon his release from prison, he would have to comply with the registration provisions of Megan's Law II. Appellant filed a motion to modify his sentence, which the trial court denied.

On appeal to the Superior Court, appellant argued, *inter alia,* that the trial court erred in admitting Dr. Valliere's expert testimony that appellant met the statutory criteria for classification as an SVP without first subjecting that testimony to a *Frye* hearing on admissibility. Appellant claimed that, under the *Frye* standard, Dr. Valliere's testimony was inadmissible expert scientific evidence because she made a subjective assessment using statutory terms ("sexually violent predator" and "mental abnormality") not generally accepted in the relevant scientific community and having no clinically significant meaning in the field of psychology. The panel rejected appellant's argument in a unanimous, published opinion, finding that the testimony of a psychological or psychiatric expert offered at an SVP proceeding is not novel scientific evidence subject to *Frye* because the statutory enactment itself provides the factors for the expert to consider in making the SVP determination. The panel further noted that Dr. Valliere had testified that those factors were not created by the General Assembly arbitrarily, but rather reflected a body

of psychological literature and research on the subject of sexual predators and their risk of recidivism. The court agreed with the trial court that it would defy logic to ask an expert witness to apply Megan's Law II in conducting an assessment and then exclude the expert's testimony merely because she employed Megan's Law II language in her assessment. Finally, the court concluded that the methodologies used by Dr. Valliere—specifically, her review of appellant's prior offense history, as well as her reliance on psychological literature and research and her own experience in evaluating sexual predators—were not novel. *Commonwealth v. Dengler*, 843 A.2d 1241 (Pa.Super.2004).

■■ This Court granted further discretionary review to consider this first impression issue involving *Frye* and to provide further guidance on the question of when scientific evidence may properly be deemed excludable as new or novel. As a general rule, this Court's standard of review of a trial court's evidentiary ruling, including a ruling whether expert scientific evidence is admissible against a *Frye* challenge, is limited to determining whether the trial court abused its discretion. *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038, 1046 (2003); *Zieber v. Bogert*, 565 Pa. 376, 773 A.2d 758, 760 n. 3 (2001) (citing *Commonwealth v. Minerd*, 562 Pa. 46, 753 A.2d 225 (2000)). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady*, 839 A.2d at 1046 (citing *Paden v. Baker Concrete Constr., Inc.*, 540 Pa. 409, 658 A.2d 341, 343 (1995)).

Appellant argues that Dr. Valliere's testimony should be subject to a preliminary *Frye* assessment because it involves novel science. Specifically, appellant asserts that reliance on assembled records without any personal assessment of the offender is unusual and not standard psychological or psychiatric practice. Further, the fact that the Megan's Law II hearing occurs prior to sentencing, when the offender's release date is unknown, makes the assessment inherently unreliable.

As a corollary to this point, appellant claims that because the reporting and notification requirements do not occur until after the offender's release, any prediction regarding his likelihood of reoffense is remote and questionable. Appellant also points to Dr. Valliere's testimony that predictions in this area are notoriously unreliable and reasons that, therefore, the doctor could not predict with any accuracy whether appel-lant would reoffend or what rehabilitative effect sexual offender treatment might have on appellant while he is incarcerated.

Appellant also takes issue with the statutory language Dr. Valliere used in her assessment. He complains that the concepts of "mental abnormality" and "sexually violent predator" are not generally accepted diagnoses in the psychological or psychiatric communities. Because there is no typical personality profile that indicates an individual may be an SVP, appellant argues, an assessor cannot look to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (DSM–IV) or any other scientific source to find an objective list of indicators. Finally, appellant argues that Dr. Valliere's diagnosis that he has a personality disorder does not necessarily imply that appellant cannot control his behavior in the future.

The Commonwealth responds that appellant cannot be heard to complain that Dr. Valliere relied on records without conducting a personal evaluation of him because appellant refused to meet with her. If, as appellant claims, the methodology Dr. Valliere used in this case is not generally accepted in the relevant community due to the lack of a personal interview, then an offender would be able to control the outcome of the SVP process by granting or refusing an interview to the assessor. The Commonwealth argues that this is not what the General Assembly intended when enacting Megan's Law II.

As for the general admissibility of this type of evidence concerning whether an offender meets the statutory criteria for classification as an SVP, the Commonwealth argues that the General Assembly affirmed the relevant construct by incorporating psychological literature and research into the statute. Moreover, echoing Dr. Valliere's testimony, the Com-

monwealth notes that the factors listed in the statute for an assessor to consider were not created arbitrarily, but rather are the result of the incorporation of this psychological literature and research. Thus, according to the Commonwealth, the validity of the SVP assessment process has already been determined by the statute. Further, the legislative use of the terms "sexually violent predator" and "mental abnormality" are appropriate given the purpose of the assessment. The Commonwealth notes that the task for the assessor and the trial court is not a diagnostic one for treatment purposes; instead, these are legal terms drawn from the language of Megan's Law II, designed to provide a basis to determine when the SVP protections of the law should be triggered.

Rule 702 of the Pennsylvania Rules of Evidence addresses the general admissibility of expert testimony where scientific evidence is at issue:

Rule 702. Testimony by experts

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702. This Court has noted that the *Frye* test, which was adopted in Pennsylvania in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), "is part of Rule 702." *Grady*, 839 A.2d at 1042. In *Frye*, the Court of Appeals of the District of Columbia considered whether expert evidence concerning a blood pressure "deception test," which supposedly determined whether a test subject was being truthful based on changes in blood pressure, was admissible against a criminal defendant. In rejecting the evidence, the court opined that, to be admissible, the evidence must be sufficiently established and accepted in the relevant scientific community:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while

courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014. This passage sets forth the core of what has come to be known as the *"Frye* test."

In *Topa*, where this Court considered spectrographic voice print identification evidence, we described the *Frye* standard as follows: "Admissibility of the [scientific] evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs." *Id.* at 1281. In finding that the proffered scientific evidence was inadmissible in *Topa*, the Court quoted the rationale set forth by the Court of Appeals of the District of Columbia in *United States v. Addison*, 498 F.2d 741, 744 (D.C.Cir.1974):

"The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential."

*Topa*, 369 A.2d at 1282.

This Court has consistently followed this manner of approach when confronted with novel scientific evidence in the three decades since our adoption of *Frye. See Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981) (process of refreshing recollection by hypnosis not yet accepted); *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992) ("Sexually Abused Child Syndrome" evidence not admissible); *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992) (electro-

phoresis test of dried blood stains deemed admissible); *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395 (1994) (certain DNA evidence deemed inadmissible); *Dalrymple v. Brown,* 549 Pa. 217, 701 A.2d 164 (1997) (repressed memory theory deemed inadmissible); *Commonwealth v. Crawford,* 553 Pa. 195, 718 A.2d 768 (1998) (revived repressed memory testimony rejected); *Blum ex rel. Blum v. Merrell Dow Pharmaceuticals, Inc.,* 564 Pa. 3, 764 A.2d 1 (2000) (expert testimony regarding causal link between mother's ingestion of drug and child's birth defect deemed too unreliable to be admitted where it involved recalculation of data used in other studies); *Grady, supra* (expert witness's conclusion concerning safety of food product inadmissible because expert's methodology lacked general acceptance in relevant scientific community for purposes of reaching such conclusion). In addition, in *Grady,* this Court recently made clear that *Frye* would remain the governing Pennsylvania standard, and not the newer federal standard represented by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Grady,* 839 A.2d at 1044–45.[5]

The question before this Court today is whether the evidence at issue in this case—the testimony of Dr. Valliere that appellant met the statutory criteria for classification as an SVP—is scientific evidence which is subject to the evidentiary screening function served by the *Frye* test. This Court has made it clear that *Frye* is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science. *Commonwealth v. Delbridge,* 580 Pa. 68, 859 A.2d 1254, 1260 (2004) (plurality opinion) (citing Pa.R.E. 702 and *Grady,* 839 A.2d at 1044). What constitutes novel scientific evidence has historically been decided on a case-by-case basis, and there is some fluidity in the analysis; indeed, science deemed novel at the outset may lose its novelty and become generally accepted in the scientific

5. We note that both the parties and the amicus in *Grady* indicated a preference for retaining *Frye* over *Daubert,* and thus this Court was presented with no advocacy favoring *Daubert.*

community at a later date, or the strength of the proponent's proffer may affect the *Frye* determination.

In *Grady*, the plaintiff sought to introduce expert testimony concerning the downward force required to break "Doritos" chips as well as the expert's conclusion that Doritos remain too hard and too sharp after being chewed to be swallowed safely. This Court held that, while the methodology used by the expert to calculate the downward force may have been generally accepted in the scientific community, his methodology was not generally accepted as a means to reach the conclusion that an item remains too hard and sharp to swallow safely after being chewed. Accordingly, this Court found that the trial court did not abuse its discretion in ruling the scientific conclusion inadmissible. 839 A.2d at 1047.

In *Blum*, this Court found the methodology used by the plaintiff's expert to be "flawed," and "unreliable" under the *Frye* test, and thus concluded that the proffered evidence was inadmissible. The trial court in *Blum* had permitted the plaintiffs to introduce expert testimony that the drug Bendectin, which Mrs. Blum had ingested while pregnant, caused her son's birth defects. In reaching his conclusion, the plaintiff's expert apparently used portions of studies conducted by others, and working backwards through the data in those studies, recalculated the data to reach conclusions not reached by the original studies. 764 A.2d at 4 & n. 5. This Court determined that the expert's "procedure cannot be fairly described as generally accepted methodology" for *Frye* purposes, and thus we affirmed the Superior Court's holding that the trial court had erred in deeming the evidence admissible.[6]

6. In deeming the scientific evidence inadmissible, *Blum* did not explicitly analyze the case under the abuse of discretion standard later made clear in *Grady*. Mr. Justice Cappy (now Chief Justice) and this Justice authored separate dissenting opinions in *Blum;* both dissents would have reaffirmed the *Frye* test. It should be noted that one of the concerns shared by the *Blum* dissenting opinions was that the *Frye* test not be expanded to exclude an expert's testimony on grounds that his conclusions (as opposed to his methodology) were not generally accepted in the relevant scientific community. The dissents' view on this discrete point was later accepted in *Grady*. *See* 839 A.2d at 1045 & n. 13.

With these authorities in mind, we find no abuse of discretion on the part of the trial court in entertaining the testimony of Dr. Valliere without first subjecting it to a *Frye* analysis. This is so primarily because we are satisfied that Dr. Valliere's testimony did not involve science which could properly be deemed novel under *Frye*. This case does not pose the classic *Frye* scenario. The Commonwealth has not come into court and offered penological, psychological or psychiatric literature and research, or the examples of other states with SVP laws, and then asked the court, as a common law matter, to adjudicate SVP status and to devise some sort of consequence attending that designation. Rather, the "science" here (and the SVP designation consequences it triggers) is responsive to, indeed it is a direct byproduct of, a specific legislatively-adopted scheme which sets forth the relevance and contours of the challenged evidence. The General Assembly has determined that a sexual offender's SVP status is significant to the operation of the registration and notification provisions of the law. The Assembly has defined the triggering term ("sexually violent predator") and has set forth the factors to be considered in making that determination. This scheme represents a legislative policy judgment concerning the proper response to certain sexual offenders. The question of SVP status is thus a statutory question, not a question of "pure science" and, at least in the absence of a challenge to the propriety of the substance of the statute, the question of evidentiary relevance is framed by the very provisions of the statute itself, not some external source.

Because this case involves a legislative construct and not a matter of common law, appellant simply misses the mark in criticizing Dr. Valliere's testimony on grounds that it does not square with prevailing standards and methodology in the psychological and psychiatric diagnostic communities. The statute does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm. As Dr. Valliere testified, the opinion she renders in a sex offender assessment is not strictly diagnostic in the psychological sense; rather, her opinion must account for

statutory factors, such as "the research, his behavior, his past records, his previous diagnoses," all of which affect the opinion she then forms and renders on the *statutory* question of SVP status. In seeking to protect society against certain sexual offenders, the General Assembly was not obliged to adopt a certain diagnostic construct, and it is the construct that was actually adopted which must control this Court's analysis of the relevance and admissibility of evidence offered to prove the statutory standard.

The terms with which appellant takes issue—"mental abnormality" and "sexually violent predator"—are defined in detail in Megan's Law II, essentially making them terms of art. *See* 42 Pa.C.S. § 9792. Also, as we have noted above, our General Assembly promulgated an exhaustive list of factors for an assessor such as Dr. Valliere to consider in making an SVP assessment. *Id.* § 9795.4. Because the legislature provided the framework for assessing whether an offender is an SVP, expert testimony tracking that framework, by definition, should be deemed generally accepted in the community of professionals who conduct SVP assessments. The testimony of a credentialed psychologist or psychiatrist conducting an SVP assessment which follows the statutory formula for an assessment cannot be deemed "novel science" and therefore no *Frye* hearing is necessary.

A review of Dr. Valliere's testimony and report corroborates that the legislative standard here is discreet and ascertainable. The doctor testified that the documents she reviewed in assessing appellant were "records that are regularly relied upon in this kind of evaluation." N.T. 7/18/02 at 13. As a result of her review of the documents, which included documents related to the current offense and appellant's prior offenses, Dr. Valliere concluded that appellant has a personality disorder or mental abnormality and that his history of abusing young girls "suggests that he has a deviant sexual arousal toward young females which has resulted in criminally sexually aggressive behavior." Dr. Valliere found that appellant was driven to sexually assault as demonstrated by the fact that he did not appear to fear being caught—at least one

assault was committed while a family member of the victim was in the home, and appellant committed one assault shortly after being arrested for another. She described appellant as fantasy driven because in his version of at least two of the assaults, the victim initiated the sexual contact. Based upon her investigation, education and work experience, Dr. Valliere then opined that appellant met the criteria for classification as an SVP. Since Dr. Valliere's findings follow the factors set forth in § 9795.4, there is no novel science requiring screening pursuant to the *Frye* test.

In further support of our holding that this evidence is not subject to screening under *Frye*, we note that other jurisdictions have held, under a traditional *Frye* analysis, that *Frye* does not apply to expert psychological or psychiatric testimony regarding a sexual offender's likelihood of recidivism because such evidence is not novel. The Superior Court made specific note of the particularly instructive Florida District Court of Appeals decision in *Westerheide v. Florida*, 767 So.2d 637 (Fla.Dist.Ct.App.2000), *approved on other questions*, 831 So.2d 93 (Fla.2002), where that court held that expert testimony in aid of determining if an offender is an SVP under the Florida version of Megan's Law is not subject to *Frye*. In *Westerheide*, the offender was subject to commitment as an SVP and, as part of the commitment process, he was assessed to determine if he was an SVP. The offender challenged the trial court's admission of expert testimony that he was likely to reoffend, arguing that the evidence was subject to exclusion under *Frye*. The court rejected the argument, stating:

> Courts in other jurisdictions that have specifically addressed application of the *Frye* analysis to expert testimony in cases involving sexually violent predator acts substantially similar to Florida's Act have held that *Frye* does not apply. For example, in *People v. Ward*, 71 Cal.App.4th 368, 83 Cal. Rptr.2d 828 (1999), the court specifically held that *Frye* does not apply to a "psychiatrist's prediction of future dangerousness or a diagnosis of mental illness" and concluded that "the trial court did not abuse its discretion when it admitted

expert testimony regarding the likelihood that defendant was an SVP and likely to reoffend." *Id.* at 831–32.

The appellant here, however, maintains that the lower court erred in admitting expert testimony because a predicate was not established that the experts were capable of accurately predicting whether the appellant would reoffend. The admission of expert testimony from psychologists and psychiatrists for the purpose of predicting future dangerousness caused by mental illness or abnormalities is nothing new or novel to the law. The sciences of psychiatry and psychology have been an integral part of American jurisprudence since its inception and although this type of expert testimony is not amenable to mathematical precision, we find that predictions of future dangerousness are sufficiently accurate and reliable to be admissible. We are not alone in this decision. Courts in other jurisdictions have reached the same conclusion in cases involving application of statutory schemes similar to the Florida Act that commit violent sexual predators for control, care, and treatment. *See In re Detention of Campbell,* 139 Wash.2d 341, 986 P.2d 771 (1999); *In re Young,* 122 Wash.2d 1, 857 P.2d 989 (1993); *Aguilar v. State,* 77 Wash.App. 596, 892 P.2d 1091 (1995); *People v. Ward,* 71 Cal.App.4th 368, 83 Cal.Rptr.2d 828 (1999); *see also Martin v. Reinstein,* 195 Ariz. 293, 987 P.2d 779 (Ct.App.1999).

*Westerheide,* 767 So.2d at 657.

Appellant cites a number of cases from other jurisdictions which, he argues, hold that expert testimony regarding an offender's likelihood to reoffend is subject to the *Frye* test. Those cases, however, provide no basis for this Court to impose such a restriction upon this legislative scheme. Moreover, every case cited by appellant involves an expert whose SVP assessment was based upon actuarial tests used to determine the risk of recidivism.[7] Because Dr. Valliere did not use

7. *See Collier v. Florida,* 857 So.2d 943 (Fla.Dist.Ct.App.2003) (actuarial tests used to assess offender are subject to *Frye* analysis); *In re Detention of Bolton,* 343 Ill.App.3d 1223, 279 Ill.Dec. 286, 800 N.E.2d 128 (2003) (testimony relying on actuarial tests subject to *Frye* standard); *In*

any actuarial tests in rendering her assessment of appellant, these cases do not support appellant's argument.

For the foregoing reasons, we affirm the Superior Court.

Chief Justice CAPPY, and Justices NEWMAN, SAYLOR and EAKIN join the opinion.

Justice NIGRO did not participate in the decision of this case.

Justice BAER files a concurring opinion.

Justice BAER, concurring.

I agree with the Majority that the expert testimony adduced in this case does not derive from a novel theoretical or methodological foundation under *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), and our decisions thereunder. *See, e.g., Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1045 (2003). Thus, the trial court did not abuse its discretion in admitting the evidence. Accordingly, I agree with the Majority's conclusion. I write separately, however, because I cannot subscribe to those aspects of the Majority Opinion that suggest that a statute setting forth factors to gird a particular scientific inquiry in itself relieves a court from conducting an independent analysis under *Frye* of the novelty of a given theory or method used to address those factors.

As the Majority notes, in *United States v. Addison,* 498 F.2d 741 (D.C.Cir.1974), the United States Court of Appeals for the District of Columbia Circuit observed that "[t]he requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice." *Id.* at 744–45; *see* Maj. Op. 586 Pa. at 68, 890 A.2d at 381. In *Addison,* the court of appeals observed that the *Frye* test protects the "essential" ability of the opponent of challenged testimony "to produce rebuttal experts, equally conversant

re Detention of Traynoff, *338 Ill.App.3d 949, 273 Ill.Dec. 691, 789 N.E.2d 865 (2003) (actuarial tools used to predict likelihood of reoffense must meet* Frye *standard).*

with the mechanics and methods of a particular technique" deployed by the proffered expert. 498 F.2d at 744. Evidence derived from truly novel theories or methodologies, of course, militates against this aim, insofar as the opponent may find a dearth of available experts prepared to meet such a proffer. Accordingly, we have held that it is not novel conclusions that are subject to scrutiny under *Frye*, but only conclusions based upon novel theories or methodologies. *See Grady*, 839 A.2d at 1045 (clarifying that, while the proponent must prove the general acceptance in the relevant scientific community of the methodology used, the proponent need not also prove "that the scientific community has also generally accepted the expert's conclusion"); *see also Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117, 1119 (1998) ("This Court has generally required that both the theory and technique underlying novel scientific evidence must be generally accepted.")

In sanctifying as conclusive of the *Frye* inquiry the Megan's Law criteria for assessing whether an offender is a Sexually Violent Predator (SVP), *see* 42 Pa.C.S. § 9795.4(b), the Majority proves far more than its ruling requires. The Majority finds *Addison's* "determinative voice" not in the relevant scientific community but in the legislature. The Majority writes:

> Because this case involves a legislative construct and not a matter of common law, appellant simply misses the mark in criticizing Dr. Valliere's testimony on grounds that it does not square with prevailing standards and methodology in the psychological and psychiatric diagnostic communities. The statute does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm. As Dr. Valliere testified, the opinion she renders in a sex offender assessment is not strictly diagnostic in the psychological sense; rather, her opinion must account for statutory factors, such as "the research, his behavior, his past records, his previous diagnoses," all of which affect the opinion she then forms and renders on the statutory question of SVP status. In seeking to protect society against certain sexual offenders, the

General Assembly was not obliged to adopt a certain diag-
nostic construct, and it is the construct that was actually
adopted which must control this Court's analysis of the
relevance and admissibility of evidence offered to prove the
statutory standard.

Maj. Op. 586 Pa. at 71–72, 890 A.2d at 383. The Majority
concludes, in a similar vein, that "[b]ecause the legislature
provided the framework for assessing whether an offender is
an SVP, expert testimony tracking that framework, **by defini-
tion,** should be deemed generally accepted in the community
of professionals who conduct SVP assessments." *Id.* at 72,
890 A.2d at 383 (emphasis added); *see also id.* at 73, 890 A.2d
at 384 ("Since [the expert's] findings follow the factors set
forth in § 9795.4, there is no novel science requiring screening
pursuant to the *Frye* test.").

Regardless of whether the expert opinion called for under
the statute is "not strictly diagnostic in the psychological
sense," it is his or her singularly scientific expertise that
qualifies a witness to furnish such an assessment. Whatever
diagnostic or non-diagnostic construct the legislature set forth,
nothing in the statute denies the trial court its traditional
prerogative to determine the legitimacy of the science under-
lying testimony proffered in support of a statutory assess-
ment. Insofar as this determination falls under Pa.R.E. 702,
*Frye* is, in the first instance, an aspect of that inquiry,
notwithstanding the basis or contour of the statutory factors.
*Grady,* 839 A.2d at 1045 (holding that "the *Frye* requirement
is one of several criteria" that must be satisfied under Rule
702).[1] That the legislature institutes a governing standard,
whether diagnostic or statutory, offers no assurance that there
will be a body of experts equipped to testify under the
legislative standard from the same theoretical or methodologi-

---

1. Although this Court has, in the past, deferred in the *Frye* context to
legislative standards as evincing a given scientific method's non-novel-
ty, *see generally Commonwealth v. McGinnis,* 511 Pa. 520, 515 A.2d 847
(1986), the Majority offers no authority for the broader proposition that
legislative enactments, as such, deny trial courts the prerogative to
assess the novelty of the science that underlies expert testimony apply-
ing a statutory framework in a particular case.

cal framework, the very situation *Frye* and progeny sought to remedy.[2]

Because I believe the appropriate answer to the *Frye* predicate inquiry concerning novelty can be reached without resort to deference to the enactments of the General Assembly, which collectively has no peculiar expertise in the relevant disciplines, I would not reach so far. Courts' long-standing and undisputed reliance on psychological and psychiatric testimony and evidence [3] illustrates beyond cavil that the standard theories and methods employed in those practices are pervasive and anything but novel to practitioners or the courts.[4] The instant challenge distilled to its essence goes not to the novelty of the expert's methods but to the legitimacy of the expert's conclusions, which in turn goes not to admissibility

**2.** If the legislature, for example, passed an act enshrining phrenology as the discipline best suited to an SVP assessment, such assessments might grind to a halt indefinitely for want of practitioners. Were the Commonwealth then to locate one expert in that archaic pseudo-science to testify on its behalf in all such cases, defendants likely would be hard-pressed to find witnesses versed in the theories and methods of phrenology to rebut the Commonwealth's evidence. That the statute might require adherence to such a standard does not in itself free litigants or the courts from the problems identified in *Addison* regarding either side's ability to furnish rebuttal testimony.

**3.** *Amicus Curiae* Defender Association of Philadelphia observes that SVP assessments sometimes are conducted by trained counselors without credentials in the disciplines of psychology or psychiatry. Brief of *Amicus Curiae* at 15–16 & n. 7. The instance or prevalence of this practice does not materially affect my position on this issue.

**4.** *See, e.g., Barefoot v. Estelle,* 463 U.S. 880, 896, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) ("The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel."); *id.* at 898, 103 S.Ct. 3383 ("Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists."); *In re Thorell,* 149 Wash.2d 724, 72 P.3d 708 (2003), and cases cited therein; *Westerheide v. Florida,* 767 So.2d 637, 656–57 (Fl.Dist.Ct.App.2000), *aff'd,* 831 So.2d 93 (Fl.2002) (noting, vis-à-vis the necessity of a full *Frye* analysis of expert psychological testimony under Florida's Megan's Law-equivalent statute, that "the record clearly shows that in formulating their opinions, neither expert used any psychological profile or syndrome designed to identify violent sexual predators;" rather, the experts "rendered their opinions in this case based on their training and experience").

but to weight. *See, e.g., In re Thorell,* 149 Wash.2d 724, 72 P.3d 708, 725 (2003).

The testimony of the Commonwealth's expert in this case, taken as a whole, clearly indicates that the methodology she employed in reaching her conclusions was consistent with generally accepted practices in clinical psychology, practices the courts have long-since determined are sufficiently valid to lead to admissible testimony and evidence. Of course, where novel or suspect conclusions are reached from generally accepted postulates, there may be ample room to impeach the expert testimony in question. Because *Frye* applies only to the principles underlying the conclusions; as noted, such inquiries go not to admissibility but to weight. It appears that the expert in this case was cross-examined extensively but, in view of the factfinder, unavailingly. It is not our place to reach the factfinder's determinations of weight and credibility absent an abuse of discretion.

In sum, I believe the theory and methodology underlying the SVP assessment conducted pursuant to statute *in this case*[5] is wholly non-novel, notwithstanding its demonstrable flaws and predictive limitations. The same methods and techniques have for many years been held admissible in related contexts here and elsewhere. Because the trial court's determination to that effect in the instant case does not amount to an abuse of discretion, I would affirm. Accordingly, I respectfully offer this Concurring Opinion.[6]

Justice NIGRO did not participate in the decision of this case.

---

**5.**  Although we need not reinvent the wheel each time a party raises a *Frye* challenge to the sort of scientific method previously approved by a binding appellate court ruling, trial courts still should evaluate each challenge based on the putative novelty of the theory and methodology underlying proffered expert evidence or testimony. Indeed, the overarching source of my concerns articulated herein is the prospect that courts might deem the Majority analysis to reflect a *per se* preclusion of an analysis for novelty in the first instance of any proffered methodology in the context of SVP assessments.

**6.**  I recognize that the Majority Opinion pays more than lip service to those propositions that animate my Concurring Opinion. *See, e.g.,* Maj.

Op. at 71, 890 A.2d at 382. (finding no abuse of discretion "primarily because [the Court] is satisfied that Dr. Valliere's testimony did not involve science which could properly be deemed novel under *Frye* "). Because I view the Majority's analysis as amenable of several interpretations, however, I respectfully disagree with just those aspects of the Majority's analysis that are inconsistent with the foregoing discussion.