**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Robert Lee STEPHENS, Appellant.**

Superior Court of Pennsylvania.

Submitted May 20, 2013.

Filed July 11, 2013.

Robert C. Keller, Havertown, for appellant.

Nicholas J. Casenta, Jr., Assistant District Attorney, West Chester, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., PANELLA, J., and COLVILLE, J.*

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Chester County following Appellant's conviction on the charges of Aggravated Indecent Assault on a female child less than 13 years of age, 18 Pa.C.S.A. § 3125(a)(7), Endangering the Welfare of Children, 18 Pa.C.S.A. § 4304(a), five counts of Indecent Assault, 18 Pa.C.S.A. § 3126(a)(7), and Corruption of Minors, 18 Pa.C.S.A. § 6301(a)(1). Appellant challenges the trial court's ruling that a recorded phone conversation was inadmissible as hearsay and the trial court's determination that Appellant is a sexually violent predator ("SVP") for purposes of Megan's Law.[1] We affirm.

The relevant facts and procedural history are as follows: Appellant was arrested and, on May 9, 2011, represented by counsel, he proceeded to a jury trial. At trial, the victim, L.M., testified that Appellant, who was her mother's paramour at the time, had engaged in multiple instances of

---

* Retired Senior Judge assigned to the Superior Court.

1. 42 Pa.C.S.A. § 9791 et seq.

inappropriate sexual conduct with her over a two-year period. N.T. 5/9/11 at 10–20. At the start of this two-year interval, the victim was either 8 or 9 years old. N.T. 5/9/11 at 11. The incidents concluded when she was 10. N.T. 5/9/11 at 24. These incidents included Appellant repeatedly fondling private areas of the victim's body, placing her hand on his penis, and in one instance digitally penetrating the victim. N.T. 5/9/11 at 10–20.

The victim did not come forward with information about her molestation for several years. In the summer of 2009, the victim confided in her then-boyfriend, Eric Lochman, that Appellant had abused her. N.T. 5/9/11 at 25. The victim swore Mr. Lochman to secrecy, and he complied until the current case was brought to light. N.T. 5/9/11 at 71. A few weeks after confiding in Mr. Lochman, the victim also informed her mother about the incidents that had taken place with Appellant. N.T. 5/9/11 at 26.

After learning about the incident with her daughter and Appellant (the mother's ex-boyfriend), the victim's mother immediately called and confronted Appellant with these accusations. N.T. 5/10/11 at 98. A few weeks later, the victim's mother contacted Children, Youth, and Families ("CYF"). *Id.* The matter eventually made it to the Pennsylvania State Police.

After the State Police received the case, Trooper Jones met with the victim. N.T. 5/10/11 at 128. Trooper Jones obtained consent to intercept and record a phone call between the victim and Appellant. N.T. 5/10/11 at 133. The purpose of the call was to try to elicit a confession from

Appellant; he did not give one. *Id.* Charges were then filed against Appellant and the case was scheduled for a preliminary hearing in September of 2010. N.T. 5/10/11 at 128–129. After Appellant failed to appear at his hearing, the victim's mother called him again. N.T. 5/10/11 at 103–104. While speaking with Appellant, the victim's mother testified that Appellant said, "it's [the charges] all your fault. You wanted things to happen between me and L.M. You put her in bed with me. You basically forced things to happen." N.T. 5/10/11 at 104.

At the conclusion of all testimony, Appellant was convicted on the charges indicated *supra.* Appellant was sentenced to an aggregate of two and a half to five years in prison, along with five years of supervised probation following his release. During the trial, the Honorable Senior Judge Ronald Nagle refused to allow into evidence the intercepted phone call in which Appellant denied the allegations against him [2]. Furthermore, in a later hearing, the trial court determined that Appellant is a sexually violent predator. Appellant filed a timely post-sentence Motion for New Trial in which he contended that the trial court erred as a matter of law by precluding from evidence the recording of the intercepted phone call between the victim and Appellant. The trial court denied this motion. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

*Admissibility of Intercepted Phone Call*

Appellant's first contention is that the trial court erred as a matter of law when it precluded from trial an audio recording of

---

**2.** On September 16, 2009, Trooper Jones obtained consent from the victim to intercept a phone call between her and Appellant. The phone call took place on September 25, 2009 and was recorded by the Pennsylvania State Police. During the call, the victim accused Appellant of molesting her and Appellant denied all allegations. Appellant's counsel attempted to enter a recording of the intercepted phone call into evidence, but the Honorable Senior Judge Ronald Nagle found that it was inadmissible as hearsay.

the intercepted phone call between Appellant and the victim. Specifically, Appellant believes that the phone call is admissible since it falls into either the "present sense impression" exception to hearsay or the "excited utterance" exception. Appellant's Brief at 8–9.

 "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Kuder*, 62 A.3d 1038, 1053 (Pa.Super.2013) (citations omitted). Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Commonwealth v. Glass*, 50 A.3d 720, 725 (Pa.Super.2012) (citations and quotation omitted). Furthermore, "because the trial court indicated the reason for its decision ... our scope of review is limited to an examination of the stated reason." *Commonwealth v. O'Brien*, 836 A.2d 966, 968 (Pa.Super.2003) (citations and quotation omitted).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa.R.E. 802. However, certain statements are not excluded by the hearsay rule, even though the declarant is available as a witness. *See* Pa.R.E. 803.

One of the listed exceptions to the hearsay rule is present sense impression. Pa. R.E. 803(1). Present sense impression is defined as "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *Id.* Furthermore, the "declarant need not be excited or otherwise emotionally affected by the event or condition perceived." Comment to Pa.R.E. 803(1). "The trustworthiness of the statement arises from its timing. The requirement of contemporaneousness, or near contemporaneousness, reduces the chance of premeditated prevarication or loss of memory." *Id.*

 In this case, Appellant knew of the accusations against him weeks before the intercepted phone call between him and the victim. N.T. 5/10/11 at 98. Immediately after learning about the molestation, the victim's mother called and confronted Appellant, who was a former paramour. *Id.* Therefore, when the victim called to elicit a confession, Appellant was well aware of the charges he may face. The weeks between phone calls gave Appellant an opportunity to create a false statement, which means Appellant was not contemporaneously perceiving the event at the time of the intercepted phone call. *See Commonwealth v. Cunningham*, 805 A.2d 566, 573 (Pa.Super.2002) (911 call by roofers witnessing a robbery in progress was found to be present sense impression exception to hearsay). Furthermore, Appellant's opportunity to fabricate a false statement also means that he was not receiving the phone call "immediately after" perceiving the event. *Commonwealth v. Hood*, 872 A.2d 175, 183 (Pa.Super.2005) ("The rationale for this exception is that the relative immediacy of the declaration insures that there will have been little opportunity for reflection or calculated misstatement."). Therefore, the trial court did not abuse its discretion when it ruled that the evidence was not admissible under the present sense impression exception to hearsay.

Appellant further asserts that the intercepted phone call should fall under the "excited utterance" exception to hearsay. The excited utterance exception applies when there is a "statement relating to a startling event or condition, made while the declarant was under the stress of the excitement that it caused." Pa.R.E. 803(2). There is no requirement that the statement describe or explain the startling event or condition but it does have to relate to it. Comment to Pa.R.E. 803(2). "The crucial question, regardless of time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." *Id.*

In the instant case, Appellant was not making excited utterances during the intercepted phone call because he had several weeks to calculate a false statement concerning the allegations against him. N.T. 5/10/11 at 98. Moreover, the trial court determined after listening to the recording that there was "neither stress nor excitement in defendant's voice at any time." Order, dated 9/6/12 at 2. The trial court also concluded, "there was no argumentation or other *indicia* that Defendant was startled by victim's repeated requests that he admit he had molested her." *Id.* Based on these conclusions, this Court believes the trial court did not abuse its discretion when ruling that the intercepted phone call was not admissible under the excited utterance exception to hearsay.

*Appellant's Classification as Sexually Violent Predator*

Appellant's second contention is that the Commonwealth failed to prove, by clear and convincing evidence, that Appellant is a sexually violent predator. "Questions of evidentiary sufficiency present questions of law; thus, 'our standard of review is de novo and our scope of review is plenary.' " *Commonwealth v. Bishop,* 936 A.2d 1136, 1141 (Pa.Super.2007) (citations omitted). In reviewing such a claim, we consider the evidence in the light most favorable to the Commonwealth, which prevailed upon the issue at trial. *Id.*

After a person has been convicted of an offense listed in § 9795.1 of the Megan's Law statute, the trial judge then orders an assessment to be done by the Sexual Offender Assessment Board ("SOAB") to help determine if that person should be classified as a sexually violent predator. *See* 42 Pa.C.S.A. §§ 9795.1–9795.4. A sexually violent predator ("SVP") is defined as "a person who has been convicted of a sexually violent offense set forth in Section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." 42 Pa.C.S.A. § 9792. In order to show that the offender suffers from a "mental abnormality" or "personality disorder," the evidence must show that the defendant suffers from a "congenital or acquired condition ... that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." *Id.* Moreover, there must be a showing that the defendant's conduct was "predatory." *See Commonwealth v. Dixon,* 907 A.2d 533, 535–36 (Pa.Super.2006). Predatory conduct is defined as "an act directed at a stranger or at a person with whom a relationship has been instituted, established, maintained, or promoted, in whole or in part, in order to facilitate or support victimization." 42 Pa.C.S.A. § 9792. Furthermore, in reaching a determination, we must examine the driving force behind the

commission of these acts, as well as looking at the offender's propensity to re-offend, an opinion about which the Commonwealth's expert is required to opine. *Commonwealth v. Fuentes*, 991 A.2d 935, 943 (Pa.Super.2010) (quotations and citations omitted). However, the risk of re-offending is but one factor to be considered when making an assessment; it is not an "independent element." *Commonwealth v. Morgan*, 16 A.3d 1165, 1170–72 (Pa.Super.2011) (citations omitted).

At the SVP hearing, the Commonwealth has the burden of proving by clear and convincing evidence that the person meets the criteria to be designated as a SVP. 42 Pa.C.S.A. § 9795.4(e)(3). This burden of proof has been described as an intermediate test, falling below the highest level of proof, beyond a reasonable doubt, but above the preponderance of the evidence standard. *Commonwealth v. Meals*, 590 Pa. 110, 120, 912 A.2d 213, 219 (2006) (citations and quotations omitted). Evidence will meet this level of proof if it is "so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue." *Id.* at 121, 219.

■ Appellant's SVP hearing was conducted on December 12, 2011, before the Honorable Ronald C. Nagle. At this hearing, the Commonwealth's only witness was Dr. Bruce Mapes. Dr. Mapes was the SOAB member that conducted Appellant's SVP assessment, and he is an expert in the field of forensic psychology. Trial Court Opinion, October 25, 2012, Appendix B at 3. In its opinion, the trial court summarized Dr. Mapes' findings from his assessment of Appellant, in which he examined all of the necessary statutory factors, as follows:

(1) Facts of the current offense, including:

"The victim related to police that Mr. Stephens engaged in a variety of sexual behaviors over approximately a two year period of time. She reported multiple incidents where she would be sitting on the couch watching television and Mr. Stephens would put his hand inside of her pants and 'grab my butt'. She told police on multiple occasions he came into her room while she was sleeping and he would take her hand and put it on his penis—this may have occurred 15 times. The victim told police when Mr. Stephens came into the bedroom she shared with her infant brother, he would be naked or in his underwear. His penis was exposed and then he would put her hand on his penis. She would then pretend to go back to sleep and Mr. Stephens would leave the room. The victim told police she did not know how long it would be before she woke up or what he may have done prior to her waking up. On one occasion, she was sleeping on the floor in the bedroom shared by Mr. Stephens and the victim's mother because the room was air-conditioned. At some point, she believes she was uncomfortable so she got into the bed where Mr. Stephens was sleeping. She believes she may have had a hole in her underwear, which is how he was able to insert his finger and 'finger me.' The victim recalls him asking her whether it felt good, but she pretended she was asleep and then it stopped. Another time she was lying in the bed with her clothes off but she does not recall whether she was going to be getting into the shower. Mr. Stephens took his fingers and was rubbing her nipples and 'making weird noises.'"

(i) Whether the offense involved multiple victims—the offenses did not.

(ii) Whether the individual exceeded the means necessary to achieve the offense—he did not.

(iii) The nature of the sexual contact with the victim. The offenses involved fondling her, digitally penetrating her, and touching his penis with her hand. Several offenses occurred while she was asleep. She also reported while sitting on the couch he would put his hand down the inside of her pants. The victim reported when Mr. Stephens digitally penetrated her he inquired whether "it felt good?" Taken together, the offenses reflect intentional behavior and would not be consistent with accidental or incidental contact, and the ongoing behavior is not consistent with a situational offense.

(iv) Relationship of the individual to the victim—pre-teen daughter of Mr. Stephens' live-in paramour.

(v) Age of the victim—8 to 10 years of age during 2 year period of molestation.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime—it did not.

(vii) The mental capacity of the victim— victim not mentally incapacitated beyond the incapacity associated with her age.

(2) Prior offense history, including:

(i) The individual's prior criminal record—2 prior arrests. Sept. 11, 1993 for reckless endangerment and DUI, resolved by ARD; October 22, 1993 simple and aggravated assault, resisting arrest, stalking, disorderly conduct, and criminal mischief. Defendant pled to resisting and was fined and required to complete community service.

(ii) Whether the individual completed any prior sentences—he did.

(iii) Whether the individual participated in available programs for sexual offenders—none required or completed.

(3) Characteristics of the individual, including:

(i) Age of the individual—Mr. Stephens was age 32–35 when offenses occurred.

(ii) Use of illegal drugs by the individual—none reported or found.

(iii) Any mental illness, mental disability, or mental abnormality—none found; however, Dr. Mapes opined that Defendant was over age 16 and more than 5 years older than the victim, and continued his molestation for a period of approximately 2 years with a prepubescent child, including fondling, digital penetration, and placing her hand on his penis while she was asleep. He identified Defendant's resulting "distress" as fear of arrest and incarceration, collectively yielding a DSM–IV TR diagnosis of Pedophilia ("sexually attracted to females, nonexclusive type").

(iv) Behavioral characteristics that contribute to the individual's conduct— selection of prepubescent victim, sexual acts while victim slept, thereby increasing victim's vulnerability and lessening chances of detection.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of re-offense:

Dr. Mapes opined that pedophilia is recognized as a lifelong disorder, which can be treated, but cannot be cured. Such sexual interest often waxes and wanes across a lifespan such that the individual may have periods where the intensity of sexual interest is low while other times it will be high. Such interest may decrease

but not disappear with advancing age, and its intensity will increase during periods of psychosocial stressors or increased opportunity. Some pedophiles enter into relationships with women with children in order to have access to a victim.

42 Pa.C.S.A. § 9795.4(d); Trial Court Opinion, October 25, 2012, Appendix B at 11–14.

Based on these findings, Dr. Mapes concluded that Appellant suffers from pedophilia, which was the cause of his sexual offenses. Trial Court Opinion, October 25, 2012, Appendix B at 14. Dr. Mapes also opined that Appellant is at risk of re-offending because pedophilia is an incurable condition that often waxes and wanes across an individual's life. *Id.* Finally, Dr. Mapes concluded that Appellant's conduct was predatory because he had intentionally "promoted or maintained" a relationship with a child "for the purposes of sexual victimization." *Id.* As a result of these findings, Dr. Mapes classified Appellant as a SVP. *Id.*

To counter Dr. Mapes' classification, Appellant provided the opinion of Dr. Steven Samuel. Dr. Samuel opined that Appellant did not meet the criteria for pedophilia, and therefore he should not be classified as a SVP. Defense Exhibit # 1 at 4. In making this determination, Dr. Samuel relied upon his interviews with Appellant and his then present girlfriend, a review of the materials in connection with this matter, as well as the administration of the MMPI–2,[3] the Structured Clinical Interview for the DSM–IV Axis I Disorders,[4] and his colleague's administration of the AASI.[5] *Id., supra.*

■ However, these tests are not dispositive in Appellant's classification as a SVP. Dr. Mapes testified that the AASI has not been proven to be a valid measure of Pedophilia. Trial Court Opinion, October 25, 2012, Appendix B at 16–17. Furthermore, when expert opinion evidence is admitted, the factfinder is free to reject it, accept it, or give it some weight between the two. *Commonwealth v. Lee,* 956 A.2d 1024, 1029 (Pa.Super.2008) (citations and quotations omitted). Although Dr. Samuel administered tests that may be relevant in classifying someone as a SVP, the learned trial court pointed out that, "the statute [concerning SVP classification] does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm." Trial Court Opinion, dated 10/25/12 at 15 (quoting *Commonwealth v. Dengler,* 586 Pa. 54, 71–72, 890 A.2d 372, 383 (2005)). Essentially, the trial court concluded Dr. Samuels has placed too much emphasis on clinical tests and not enough on the facts of Appellant's offenses. It was largely for this reason that the trial court found Dr. Mape's assessment more credible than the assessment performed by Dr. Samuel. As the trial court was free to reject, accept, or give weight to some of the evidence, we find no error in this regard. *Lee, supra.*

---

3. Minnesota Multiphasic Personality Inventory–2: a self-report psychological test that provides information regarding test-taking attitudes, the nature and extent of psychopathology, and diagnosis.

4. These are semi-structured interviews designed to assess the presence of Axis I and Axis II psychological disorders. While many pedophiles have an Axis I or Axis II disorder, not all do. "Psychiatric Comorbidity in Pedophilic Sex Offenders", Nancy C. Raymond, M.D.; Eli Coleman, Ph.D.; Fred Ohlerking, M.A.; Gary A. Christensen, M.D.; Michael Miner, Ph.D., American Journal of Psychiatry 1999; 156: 786–788.

5. Dr. Barry Zakireh administered the Abel Assessment of Sexual Interest, which is designed to identify issues related to the nature and pattern of deviant sexual interests.

When viewed in the light most favorable to the Commonwealth, the facts of Appellant's crimes combined with Dr. Mapes' diagnosis of pedophilia provide clear and convincing evidence that Appellant suffers from a mental abnormality that makes him likely to engage in predatory, sexually violent offenses. *See Commonwealth v. Geiter*, 929 A.2d 648, 651–53 (Pa.Super.2007) (evidence that defendant was convicted of multiple sexual offenses involving a minor, was diagnosed with pedophilia, and that expert witness examined each statutory factor was sufficient to support defendant's classification as a SVP). Therefore, after a thorough review of the entire record, we affirm the trial court's SVP designation.

For all of the foregoing reasons, we affirm.

Affirmed.